ATTORNEYS FOR APPELLANT
Susan K. Carpenter
Public Defender of Indiana

Thomas C. Hinesley
Steven H. Schutte
Deputy Public Defenders
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Steve Carter
Attorney General of Indiana

James B. Martin
Deputy Attorney General
Indianapolis, Indiana

In the

# Indiana Supreme Court

No. 87S00-0106-PD-285

JOHN M. STEPHENSON,

*Appellant (Petitioner below),*

v.

STATE OF INDIANA,

*Appellee (Respondent below).*

Appeal from the Warrick Superior Court, No. 87D02-0210-PC-118
The Honorable Robert R. Aylsworth, Judge

On Petition for Post-Conviction Relief

**April 26, 2007**

**Boehm, Justice.**

After an eight-month trial, a jury found John Matthew Stephenson guilty of burglary, theft, and the murders of three people. At trial, the defense contended that the murders of John "Jay" Tyler; his wife, Kathy Tyler; and Brandy Southard were the result of a drug operation unrelated to Stephenson. The testimony of several defense witnesses implicated persons Stephenson contended were involved in the drug ring. Stephenson also presented alibi witnesses who testified to his whereabouts at the time the State alleged the murders took place. The jury found Stephenson guilty and found multiple murders as an aggravating circumstance supporting the

death penalty. The trial court, following the jury's recommendation, sentenced Stephenson to death. We affirmed both the convictions and death sentence. Stephenson v. State, 742 N.E.2d 463 (Ind. 2001), cert. denied, 534 U.S. 1105 (2002).

During both the guilt and sentencing phases of trial, Stephenson was forced to wear a stun belt in the jury's presence. No objection was made by Stephenson's trial counsel to the stun belt, and the trial record made no reference to the use of the belt. Stephenson sought post-conviction relief, alleging that (1) the use of a stun belt was structural and fundamental error; (2) trial counsel and appellate counsel were ineffective on a number of grounds, including trial counsel's failure to object to the belt; (3) new evidence undermined confidence in his convictions and death sentence; (4) prejudicial outside influences biased the jury; and (5) the State withheld material exculpatory evidence. Post-conviction relief was denied, and this appeal followed.

We affirm the denial of post-conviction relief. Specifically, we hold:

(1) Stephenson's freestanding claims of error based on his wearing a stun belt at trial were available on direct appeal and are therefore foreclosed in post-conviction proceedings;

(2) Because appearing in readily visible restraints is inherently prejudicial, if the issue had been raised on appeal, reversal would have been required unless the State had proved beyond a reasonable doubt that the error did not affect the result as to either guilt or the penalty;

(3) Stephenson's claim of ineffective assistance of counsel requires him to establish substandard performance of counsel and a reasonable probability that the result would have been different but for counsel's errors and omissions;

(4) Even if Stephenson's trial counsel's failure to object to the belt or to the lack of finding of need for any form of restraint fell below prevailing professional norms, Stephenson has failed to establish a reasonable probability that any such objection would have prevailed; he therefore has not established a reasonable probability that the result of either the guilt or the penalty phases would have changed.

(5) In death penalty cases, we are to evaluate claims of newly discovered evidence under the standard established in 2003 by Indiana Code section 35-30-2-9(k), which is

2

whether the previously undiscovered evidence undermines confidence in the conviction or sentence;

(6) Because Stephenson's claims of newly discovered evidence largely turn on the credibility of various witnesses and were rejected by the post-conviction court, they do not undermine confidence in Stephenson's convictions or death sentence;

(7) Stephenson was not deprived of his right to a fair trial or due process because of the jury's exposure to various extraneous influences; and

(8) The post-conviction court's conclusion that Stephenson failed to prove by a preponderance of the evidence that the State suppressed evidence that was material to his guilt or punishment is affirmed.

## Standard of Review

Post-conviction proceedings are civil proceedings that provide defendants the opportunity to raise issues not known or available at the time of the original trial or direct appeal. Conner v. State, 711 N.E.2d 1238, 1244 (Ind. 1999). Thus, if an issue was known and available but not raised on direct appeal, the issue is procedurally foreclosed. Timberlake v. State, 753 N.E.2d 591, 597 (Ind. 2001). If an issue was raised and decided on direct appeal, it is res judicata. Id. If a claim of ineffective assistance of trial counsel was not raised on direct appeal, that claim is properly raised at a post-conviction proceeding. Id. In post-conviction proceedings, the defendant bears the burden of proof by a preponderance of the evidence. Wallace v. State, 553 N.E.2d 456, 458 (Ind. 1990).

We review the post-conviction court's factual findings under a "clearly erroneous" standard but do not defer to the post-conviction court's legal conclusions. Stevens v. State, 770 N.E.2d 739, 746 (Ind. 2002). We will not reweigh the evidence or judge the credibility of the witnesses; we examine only the probative evidence and reasonable inferences that support the decision of the post-conviction court. Conner, 711 N.E.2d at 1245.

## I. Use of a Stun Belt at Trial

Stephenson contends that his appearance in a stun belt before the jury at his trial violated his federal constitutional rights under the Sixth and Fourteenth Amendments and also violated state law. This claim is asserted as both a freestanding claim of error and a ground for inef-

fective assistance of trial counsel. As an initial matter, this Court has ruled that the use of a stun belt is not to be ordered in Indiana courts. <u>Wrinkles v. State</u>, 749 N.E.2d 1179 (Ind. 2001). We agree with Stephenson that if this were an appeal from a trial conducted after <u>Wrinkles</u> was decided and Stephenson had objected to the use of the belt at trial, he would be entitled to a new trial as a matter of state law. In addition, <u>Deck v. Missouri</u>, 544 U.S. 622 (2005), decided after Stephenson's trial and appeal, clarified a number of relevant federal constitutional principles governing the use of restraints. However, Stephenson's trial and direct appeal occurred before <u>Wrinkles</u> and <u>Deck</u> were decided, and there was no objection to the use of the belt at Stephenson's trial. This appeal from the denial of post-conviction relief therefore presents the threshold issue of which, if any, of the claims Stephenson now asserts have been procedurally defaulted and how these issues relate to the claim of ineffective assistance of counsel.

A. *Some Relevant Settled Principles*

We think it useful to set out some settled principles of substantive law before addressing these questions. The Supreme Court of the United States has not ruled on the use of a stun belt as a violation of the Federal Constitution, but the Court has given guidance on a number of relevant points. Requiring a defendant to appear in jail garb has long been held to deny due process. <u>Holbrook v. Flynn</u>, 475 U.S. 560, 567 (1986); <u>Estelle v. Williams</u>, 425 U.S. 501, 503 (1976). An objection to jail garb is required before the "compulsion" required for a due process violation is found. <u>Estelle</u>, 425 U.S. at 512-13. In short, jail garb is categorically prohibited by the Fifth and Fourteenth Amendments if the defendant objects.

Unlike jail garb, shackling may be imposed, but only if the trial court makes a particularized finding of need in the specific case. This rule has long been in place under the common law. <u>Deck</u>, 544 U.S. at 626-27; <u>Coates v. State</u>, 487 N.E.2d 167, 169 (Ind. Ct. App. 1985). For many years courts have thought this to be a requirement of federal due process. <u>Illinois v. Allen</u>, 397 U.S. 337 (1970); <u>see also</u> <u>Deck</u>, 544 U.S. at 629. Most recently, this doctrine has been held applicable to the penalty phase as well as the guilt phase of a death penalty trial. <u>Deck</u>, 544 U.S. at 627. <u>Deck</u> also made clear, if there had been any doubt, that this rule has "constitutional dimensions" and unnecessary shackling constitutes a denial of due process. <u>Id.</u> at 629, 632. Jail garb and unnecessary shackling are both "inherently prejudicial" and, if proper objection is made, require reversal unless the State establishes "beyond a reasonable doubt that the [shack-

4

ling] error complained of did not contribute to the verdict." Id. at 635 (alteration in original) (quoting Chapman v. California, 386 U.S. 18, 24 (1967)).

As explained in Deck, three reasons underlie the prohibition on unnecessary shackling. First, visible shackling "undermines the presumption of innocence and the related fairness of the fact-finding process." Id. at 630. Second, shackling can interfere with the defendant's ability to communicate with his lawyer and participate in the defense. Id. at 631. Third, shackles impair the dignity of the judicial process. Id. at 631-32.

We have already noted that Indiana state law no longer permits the use of stun belts in Indiana courts, but that rule had not been announced at the time of Stephenson's trial. The prohibition of stun belts is not based solely on the considerations that underlie the prohibition on jail garb. It is also grounded in the perceived effect on the defendant of the threat of imminent high voltage. It thus is not wholly dependent upon the jury's awareness of the belt, and, like jail garb, is "inherently prejudicial." Wrinkles, 749 N.E.2d at 1194.

B. *Freestanding Claim of Error*

Stephenson contends that his failure to object to the belt at trial did not preclude him from raising that issue on direct appeal because use of the belt constituted "fundamental error." The parties dispute whether the use of the belt met that standard. That issue is moot insofar as Stephenson seeks to assert the belt as a freestanding claim in this post-conviction proceeding. Because no objection was raised at trial and the issue was not presented on direct appeal, a challenge to the use of the belt is foreclosed in this post-conviction proceeding as a freestanding claim of error, either "fundamental" or otherwise. See e.g., Conner v. State, 829 N.E.2d 21, 25 (Ind. 2005); Stevens, 770 N.E.2d at 756-57; Sanders v. State, 765 N.E.2d 591, 592 (Ind. 2002).

Stephenson argues that the State conceded that the use of the belt was properly before the post-conviction court as a freestanding issue. He bases this contention on the State's proposed findings and conclusions in which the State requested the trial court to find no prejudice from failure to object to the belt. The State cited as its reason for lack of prejudice the fact that the issue was before the post-conviction court. Assuming that a proposed finding can under some circumstances preclude a party from contesting its own finding, a concession as to a conclusion of law is not binding on this Court. See Myers v. State, 233 Ind. 66, 67, 116 N.E.2d 839, 839 (1954); Green v. State, 232 Ind. 596, 597, 115 N.E.2d 211, 212 (1953). Whether the issue of the

belt's use was available as a freestanding issue is a question of law. The issue is therefore foreclosed if, as here, it was available at trial and no objection was raised.

### C. *Structural Error*

In a variant of the claim of fundamental error, Stephenson also contends that the use of the belt constituted structural error that per se requires a new trial. He equates the use of the belt with an impartial judge or wrongful denial of his right to a jury trial. He cites Deck v. Missouri, 544 U.S. 622, 633 (2005) for the proposition that unnecessary restraints "almost inevitably" affect the jury's perception of the defendant and place a "thumb on death's side of the scale" of justice.[1] These contentions were available at trial and on direct appeal and were not preserved. They are therefore available only to the extent they support a claim of ineffective assistance of counsel for failure to present them.

### D. *Ineffective Assistance of Trial Counsel*

Stephenson raises the failure to object to the belt as establishing ineffective assistance of trial counsel. Stephenson raised no claim of ineffective assistance in his direct appeal. We agree that this claim is therefore properly presented in post-conviction proceedings as one of ineffective assistance of trial counsel for failure to object at trial. See Timberlake, 753 N.E.2d at 597. Under Strickland v. Washington, a claim of ineffective assistance of counsel requires the defendant to show by a preponderance of the evidence that (1) counsel's performance was below the

---

[1] Stephenson invokes Deck without addressing the point that Deck postdated his trial and direct appeal. The State points out that Stephenson's trial, appeal, and post-conviction proceeding all occurred before Deck was decided in 2005. The State notes that it found no case holding Deck is to be applied retroactively, i.e. applied in post-conviction proceedings to a trial that took place before Deck was handed down. But retroactivity is not the issue here. Stephenson makes no claim that Deck applies retroactively under the principles set forth in Teague v. Lane, 489 U.S. 288 (1989) and Daniels v. State, 561 N.E.2d 487 (Ind. 1990). Daniels adopted for Indiana the same retroactivity principles for a "new constitutional rule of criminal procedure" that apply to federal constitutional rules under Teague. Daniels, 561 N.E.2d at 488-89. Under Teague, rules that place "certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe," and those that require the observance of "procedures that . . . are 'implicit in the concept of ordered liberty,'" and "without which the likelihood of an accurate conviction is seriously diminished," may be applied retroactively. 489 U.S. at 311, 313 (internal quotation marks and citations omitted). The only authority addressing the point holds that Deck is not retroactive under Teague. Marquard v. Sec'y for Dep't of Corr., 429 F.3d 1278, 1312 (11th Cir. 2005). The requirement of a finding of necessity before restraints may be used in the penalty phase of a trial does not rise to the level of a procedure that is "implicit in the concept of ordered liberty." Id. (quoting Teague, 489 U.S. at 307); Whorton v. Bockting, 127 S. Ct. 1173, 1184 (2007); see also Schriro v. Summerlin, 542 U.S. 348, 352 (2004) ("This class of rules is extremely narrow, and it is unlikely that any has yet to emerge.").

6

objective standard of reasonableness based on "prevailing" professional norms and (2) the defendant was prejudiced by counsel's substandard performance, i.e. there is a "reasonable probability" that, but for counsel's errors or omissions, the outcome of the trial would have been different. 466 U.S. 668, 687, 694 (1984); French v. State, 778 N.E.2d 816, 824 (Ind. 2002); Stevens, 770 N.E.2d at 746; Lowery v. State, 640 N.E.2d 1031, 1041 (Ind. 1994).

The issues raised by Stephenson's claim of ineffective assistance, therefore, in broad terms are:

1) Was it substandard performance to fail to object to the use of the belt?

2) Was it substandard to fail to object to the absence of an individualized hearing on the need for any restraint?

3) Is a showing that the failure to object produced an "inherently prejudicial" condition of trial sufficient in itself to establish the prejudice prong of Strickland?

4) If an inherently prejudicial condition is shown but is not a per se ground for reversal, does the defendant bear the burden of showing prejudice by the condition or must the State establish lack of prejudice?

5) What standard of proof is required of the party with the burden as to prejudice, and was that standard met?

1. *Performance of Counsel*

The trial record makes no reference to the belt or to the need for restraint. There is no clear statement of the trial court's policy requiring restraint. There is no evidence that Stephenson was obstreperous or disruptive. In short, the record shows nothing to support an individualized determination that Stephenson required any form of restraint at trial, and there is no explanation in the trial record for use of the stun belt or any other restraint. The belt was not mentioned by the parties or the court in Stephenson's direct appeal.

a. *Failure To Object to the Belt as a Tactical Choice of Trial Counsel*

The law is clear that counsel's performance is presumed effective. "[T]he defendant must overcome the strongest presumption of adequate assistance, and judicial scrutiny is highly

7

deferential." Ben-Yisrayl v. State, 738 N.E.2d 253, 261 (Ind. 2000); see Conner, 711 N.E.2d at 1252. Moreover, as is frequently pointed out:

> There is a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. Counsel is afforded considerable discretion in choosing strategy and tactics, and these decisions are entitled to deferential review. Isolated mistakes, poor strategy, inexperience, and instances of bad judgment do not necessarily render representation ineffective.

Stevens, 770 N.E.2d at 746 (citing Strickland, 466 U.S. at 689-690; Timberlake, 753 N.E.2d at 603; Perez v. State, 748 N.E.2d 853, 854 (Ind. 2001)).

The State contends that trial counsel made a tactical decision to allow Stephenson to wear a stun belt. The record does not support this contention. At post-conviction, Anthony Long, one of Stephenson's trial counsel, explicitly stated that he made a conscious decision to allow Stephenson to appear before the jury in a stun belt: "I understood our choices were either [the stun belt] or shackles and that was certainly not an acceptable alternative." Similarly, trial counsel Dennis Vowels testified:

> Q: Do you recall any discussions with Anthony Long about the benefits of a stun belt as opposed to being shackled?
>
> A: I don't recall them, but we probably talked about it. I know we were not going to let him be shackled in front of a jury. I knew that.
>
> Q: Would you agree that a stun belt worn under the clothes would be preferable in front of a jury to the handcuffs, the waist and the leg irons?
>
> A: Yes.

At the time of Stephenson's trial in 1996 and 1997, no Indiana ruling had addressed the use of stun belts. As in Wrinkles, counsel cannot be faulted for selecting the belt over more visible shackles, given that the case law addressing the issue had largely focused on the visibility of the restraint, and not, as Wrinkles later pointed out, on the belt's potential effect on the defendant's demeanor and ability to participate in the defense. Wrinkles, 749 N.E.2d at 1194. Although counsel explained their preference for the belt over shackles, they did not explain why they conceded that any restraint was appropriate and failed to require any finding on the record as to the need for restraint. As explained above, at the time of Stephenson's trial it was well-settled as a matter of both state law and the requirements of federal due process that no form of

8

visible restraint was permissible without an individualized finding that the defendant presented a risk of escape, violence, or disruption of the trial. Deck, 544 U.S. at 626-27; Coates, 487 N.E.2d at 169. Counsel's unquestioning acceptance of the need for any form of restraint cannot be justified as a tactical decision where the decision was made without awareness of the applicable law favorable to the defendant. Dixon v. Snyder, 266 F.3d 693, 703 (7th Cir. 2001) ("If counsel was unaware of the statute, then his decision not to cross-examine Carlisle cannot be accorded the same presumption of reasonableness as is accorded most strategic decisions because it was not based on strategy but rather on a 'startling ignorance of the law.'" (quoting Kimmelman v. Morrison, 477 U.S. 365, 385 (1986))). Finally, the State's claim of a tactical decision does not enjoy the same support it had in Wrinkles. In Wrinkles's case, the penalty, not guilt or innocence, was the only real issue. The decision to challenge the belt arguably fell into the tactical range, balancing the likelihood of success against the risk of alienating the judge by challenging an announced "policy." In Stephenson's case, unlike Wrinkles, guilt was vigorously disputed, so that justification for counsel's omission is weakened, and in any event no such tactical consideration was advanced by counsel in post-conviction.

b. *Failure To Object to a Visible Restraint as Substandard Performance*

Even if failure to object to the belt was not justified as a tactical decision, the issue remains whether it was below professional norms to fail to object to the use of any restraint or to the absence of any finding of necessity for restraint. The law regarding use of stun belts was not settled at the time of Stephenson's trial, and counsel are not ordinarily found deficient for failure to anticipate a change in the law. Smylie v. State, 823 N.E.2d 679, 690 (Ind. 2005); Fulmer v. State, 523 N.E.2d 754, 757-58 (Ind. 1988).

Under the law at the time of Stephenson's trial, an ineffective assistance claim based on failure to object to restraints required the restraints to be visible. Failure to object to restraints is not substandard performance where the jury is unaware of the restraints.[2] But the Seventh Cir-

---

[2] See Evans v. Dir. of the Cal. Dept. of Corr., No. C-03-2498 MMC, 2005 U.S. Dist. LEXIS 9360, at \*23 (N.D. Cal. 2005) ("No jurors were present because the charges were tried to the court."); State v. DuPree, 820 N.E.2d 560, 566 (Ill. Ct. App. 2004) ("There [was] not a scintilla of evidence that the jury could have been aware of the stun belt."); Walker v. State, 602 S.E.2d 351, 355 (Ga. Ct. App. 2004) (finding the defendant "failed to present any evidence showing the jury would have known he was in custody due to his clothing" and "failed to identify any of the individuals he claims were in the hallway" when he was taken from the elevator to the holding cell); Lytle v. Armontrout, No. 89-0263-CV-W-5-P, 1990 U.S. Dist.

9

cuit has held that failure to object to restraints that are "readily visible" is substandard performance of counsel. Roche v. Davis, 291 F.3d 473, 483 (7th Cir. 2002) (quoting Fountain v. United States, 211 F.3d 429, 435 (7th Cir. 2000)). The Seventh Circuit found "unreasonable"[3] our conclusion that counsel was not ineffective for failure to object to shackling and failure to take steps to prevent the jury from viewing the shackles. Id.

Although Roche addressed shackling, we think its reasoning is equally applicable to a stun belt. The use of a stun belt, if perceived by the jury, produces all of the results that shackling does. It sends a signal that the defendant may be dangerous and thereby impairs the presumption of innocence; it interferes with the defendant's communication with his attorney; and it has the same effect on the dignity of the process. Indeed, some courts have concluded that a stun belt, if perceived by the jury, "may be even more prejudicial than handcuffs or leg irons because it implies that unique force is necessary to control the defendant." United States v. Durham, 287 F.3d 1297, 1305 (11th Cir. 2002) (quoting State v. Flieger, 955 P.2d 872, 874 (Wash. Ct. App. 1998)). Even if the jury is unaware of the belt, there remain the concerns that a stun belt "could disrupt a different set of a defendant's constitutionally guaranteed rights." Id. First, "[a] stun belt seemingly poses a far more substantial risk of interfering with a defendant's Sixth Amendment right to confer with counsel than do leg shackles." Id. Second, the device poses a greater threat to the defendant's Sixth Amendment and due process rights to be present and participate in his defense because "[i]t is reasonable to assume that much of a defendant's focus and attention when wearing one of these devices is occupied by anxiety over the possible triggering of the belt." Id. at 1305-06. These are in substance the same points emphasized by the majority in Wrinkles in banning the belt under Indiana state law. 749 N.E.2d at 1194. In sum, in the absence of an explanation for counsel's failure to object to a stun belt that is "readily visible," that failure is substandard performance.

LEXIS 2634, at *12 (W.D. Mo. 1990) (finding "no indication that the jury knew of or took into consideration the fact" that the defendant was restrained or in jail garb). Most of these cases dealt with shackles, not a stun belt.

[3] The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. section 2254(d) (2000), requires that a state court's interpretation of a federal constitutional doctrine be "unreasonable" before the federal court may entertain a petition for habeas corpus based on a challenge to that state court's ruling.

10

c. *Was the Belt "Readily Visible?"*

Whether the belt was "readily visible" is critical to this branch of the inquiry. <u>Roche</u>, 291 F.3d at 483 (quoting <u>Fountain</u>, 211 F.3d at 435). Some courts have used the term "visible" to make the point that shackles or jail garb must be perceived by the jury. <u>See, e.g.</u>, <u>id.</u>; <u>Deck</u>, 544 U.S. at 631-32. The broader notion is that it is prejudicial for jurors to be "aware" that a defendant is being restrained or appearing in jail garb. <u>Fountain</u>, 211 F.3d at 435. We see little significance to whether the jurors learned of the belt by seeing the restraint or by being informed of it. In either case the defendant is branded a dangerous individual.

The post-conviction court made no specific finding as to the jurors' awareness of the belt. However, the post-conviction record demonstrates that several jurors knew that Stephenson wore the belt during trial and recognized it for what it was. According to one juror's affidavit:

> During the trial, I became aware that John Stephenson was wearing a stun belt. I could see he had what appeared to be a rectangle shaped box attached to his lower back, underneath his shirt. I had seen a television show sometime previously to being selected for this jury that described what a stun belt was and what its purpose was. I have been hit by 220 volts and know what effect that amount of power has on a person. I believed the stun belt was to control John Stephenson's behavior.

Some apparently learned of the restraint from other jurors. A second juror stated in her affidavit:

> I was aware that John Stephenson was wearing a device that would prevent him from running out of the courtroom. During the trial one of the male jurors mentioned to me that Mr. Stephenson was wearing this device. I was aware that he was wearing something that controlled his behavior.

Similarly, a third juror affirmed, "During the trial, I recall that Mr. Stephenson had some type of restraining device on him. I do not recall what the device looked like, or when or where I realized he [was] wearing one." A fourth juror was asked in deposition by Petitioner's counsel, "Did you know that John Stephenson had worn a stun belt through his trial?" The juror responded:

> I would say, yes, that I did because he wasn't handcuffed, and naturally I assumed that he had that on because there was like a, you know, he wore like a loose shirt, basically like what you have on, loose, and there was a bulge back there in the back, so that's how I knew that.

It was not clear that all jurors were aware of the belt. One testified in deposition offered in post-conviction proceeding:

11

Q: Were you aware that John Stephenson was wearing a stun belt? Do you know what I mean by that, first of all?

A: I was aware of that, and I'm not sure at what time, you know, what point I was aware of that.

Q: But you know what I mean—

A: Yes.

Q: --by a stun belt?

A: Yes, I do.

Q: Okay, so go ahead if you hadn't finished your answer.

A: Well, I'm not really sure exactly if it was after the trial that, that I heard about that or – I'm thinking it was afterwards, but I'm not really sure.

Q: Did you notice it when you—

A: No.

Q: --walked by, walked past from the rear?

A: No, I never did notice it.

Even if at least one juror did not observe or recall the belt, on this record we think Stephenson has established by a preponderance of the evidence that the belt was "readily visible" to the jury.

   d. *Summary of the Performance Prong of <u>Strickland</u>.*

The record at post-conviction did not explore more fully counsel's reasoning in accepting the belt without question. For the reasons explained below in discussing the prejudice prong of the ineffective assistance claim, it may have been that counsel recognized the futility of an objection and, as in <u>Wrinkles</u>, avoided confronting the trial judge on an issue they deemed ultimately unsuccessful. On this record, however, failure to object to the belt cannot be justified as a tactical decision in Stephenson's case because the explanation offered by counsel for their decision boiled down to a failure to know the applicable law. Equally importantly, counsel failed to insist upon a finding as to the need for restraint. Prevailing norms at the time of Stephenson's trial required counsel to object to visible restraints where there is no evidence suggesting escape, violence, or disruptive behavior. We agree with <u>Roche</u> that failure to object to the belt without a showing of justification fails to meet prevailing norms. No justification for the omission is established in this record. We therefore conclude that Stephenson's counsel's failure to object to the belt meets the first prong of <u>Strickland</u>.

12

2. *Burden of Proof and Standard of Proof of Prejudice from Failure To Object to "Inherently Prejudicial" Practices*

We turn now to the issues of burden of proof and standard of proof of prejudice from failure to object to the belt.

a. *The Strickland Formulation of the Prejudice Prong*

Strickland established that prejudice from substandard performance of counsel requires a showing by the petitioner that there was a "reasonable probability" of a different result if counsel had met professional norms. We sometimes express the standard for prejudice from the failure to object as requiring a reasonable probability that the objection would have been sustained. See, e.g., Wrinkles, 749 N.E.2d at 1192 (citing Timberlake, 690 N.E.2d at 259). The standard is more precisely stated as prejudicial failure to raise an objection that the trial court would have been required to sustain. Otherwise stated, if the trial court overruled the objection, it would have committed error, and the error would have had a prejudicial effect. See, e.g., Spinks v. McBride, 858 F.Supp. 865, 877 (N.D. Ind. 1994) ("In order to establish ineffective assistance of counsel for failure to object, it must be shown that the trial court would have been required to sustain the objection had it been made." (citing Hill v. State, 442 N.E.2d 1049 (Ind. 1982))); Kimble v. State, 451 N.E.2d 302, 306 (Ind. 1983) ("Before trial counsel's failure to enter an objection may be regarded as ineffective representation, the petitioner must show that had a proper objection been made, the trial court would have had no choice but to sustain it."). In most cases there is no practical difference between these two formulations.

b. *Wrinkles v. State*

Wrinkles, like Stephenson, asserted that trial counsel were ineffective for not objecting to the court's ordering him to wear a stun belt at trial. Wrinkles contended that there was no reason to require restraint. Wrinkles, 749 N.E.2d at 1192. We recognized that a defendant has the right to appear before a jury unrestrained unless restraint is necessary for a trial without incident. Id. at 1193 (citing Bivins v. State, 642 N.E.2d 928, 936 (Ind. 1994)). We also acknowledged that this right springs from the "basic principle of American jurisprudence that a person accused of a crime is presumed innocent until proven guilty beyond a reasonable doubt" and that in order for the presumption to be effective, a defendant must appear unrestrained to avoid the appearance that guilt was a "foregone conclusion." Id. We reiterated that the reasons for requiring a defen-

13

dant to be restrained before a jury must be placed on the trial record. Id. (citing Roche v. State, 690 N.E.2d 1115, 1123 (Ind. 1997); Coates v. State, 487 N.E.2d 167, 169 (Ind. Ct. App. 1985), overruled on other grounds by Hahn v. State, 533 N.E.2d 618 (Ind. Ct. App. 1989)). Deck has now made clear that the Fourteenth Amendment imposes the same requirement. The majority in Wrinkles acknowledged that a policy requiring all defendants to wear restraints would "not likely withstand appellate scrutiny if the issue were presented." 749 N.E.2d at 1195. We none-theless held in Wrinkles that counsel's failure to object to the stun belt's use did not constitute ineffective assistance in that case. We based that ruling on a lack of prejudice, without address-ing whether counsel's performance was substandard. Id. at 1195, 1196. The reason for that holding was that the trial court's "policy" dictated use of restraint and any objection to the belt would not have prevailed. Id. The failure to require an individualized determination was not asserted as a ground of ineffective assistance in Wrinkles.

We agree with the State that Stephenson's case presents many similarities to Wrinkles. The two are not identical, however, because this record shows no inflexible "policy" of the trial court. Trial counsel Long testified that in his experience, the trial judge typically deferred to the sheriff's security decisions. The sheriff, in turn, cited concerns in transporting defendants from jail to the courtroom as the basis for requiring restraint. These concerns did not seem to relate directly to use of the belt at trial as opposed to its use in transit, but that issue was not explored at the post-conviction hearing.[4] The officers in charge of security at the trial testified that they had no knowledge of any incidents that would demonstrate a need for Stephenson to wear a stun belt.

---

[4]At the post-conviction hearing, Sheriff Hargrove testified as follows:
> Q: How was the decision made that John was going to wear this belt?
> A: We just knew that he had to get him in and out of the building without the jury seeing him in shackles or handcuffs and we elected to—it was fairly, in our opinion at the time, it may not have been the new technology, but it was something that had just come to our attention, and we decided we were going to utilize the belt for that reason.
> Q: When you—just so I'm sure—I know when you say "we" and "it was our decision," you mean you and who else?
> A: The chief deputies
> Q: The chief deputies. You didn't consult with the judge?
> A: Well I, I don't know whether—I don't recall specifically speaking to the judge, and I may have. But I know that we'd over the years, we'd had a lot of discussions with Judge Campbell regarding the – getting the inmates in and out of the jail without the, without the jury seeing them shackled or handcuffed.

14

Sheriff Bruce Hargrave; Charlie McCracken, the sergeant in charge of security at Stephenson's trial; Jerry Ash, the deputy of security; police officer Robert Irvin; and Jonetta Baker, jail commander for the Warrick County Police Department, all testified at post-conviction that to their knowledge Stephenson posed no security threat and had exhibited no behavior that would demonstrate a specific need for a restraining device at trial. There was also extensive post-conviction testimony from the sheriff's office and others that Stephenson conducted himself as a "gentleman" throughout the arrest and trial. He had turned himself in in response to reports that law enforcement was looking for him in connection with the murders and made no effort to escape either before or during trial. From the sheriff's testimony, it appears that no one gave careful consideration to the need for any restraint while Stephenson was in the courtroom at his trial. Rather, the need was assumed, and the only concern voiced by the sheriff was whether the jury would see the restraint. Although the record shows that the trial judge followed the recommendation of the sheriff, it does not indicate that either had an inflexible policy of requiring restraint, or, if so, to what cases it applied.

c. *The Effect of Deck*

As already explained, Roche found prejudice from failure to object to restraints, and Wrinkles rejected it. Both cases used the Strickland standard of a "reasonable probability" of a different result. Deck now teaches that prejudice from shackling is governed by the "inherently prejudicial" standard for constitutional error under Chapman v. California, 386 U.S. 18, 24 (1967). 544 U.S. at 635. Rather than placing the burden on the defendant-petitioner to show a reasonable probability of a different result, an inherently prejudicial error requires the State to establish, beyond a reasonable doubt, that the error has no effect on the ultimate resolution of the trial. Deck, therefore, establishes a stronger presumption of reversible error from failure to object to shackling than the Seventh Circuit applied in Roche or we applied in Wrinkles. We think, however, that Deck does not relieve the petitioner in post-conviction proceedings from the burden of establishing both the substandard performance and prejudice prongs of an ineffective assistance claim.

Before Deck was decided, most claims of ineffective assistance of counsel for failure to object to shackles or jail garb were rejected based on lack of prejudice, even though the court explicitly or implicitly assumed substandard performance. We find only one published opinion

that has addressed this issue after <u>Deck</u>.[5]  The Eleventh Circuit, in <u>Marquard v. Secretary for Department of Corrections</u>, 429 F.3d 1278 (11th Cir. 2005), addressed a post-conviction claim of ineffective assistance for failure to object to shackling at the penalty phase of a Florida death penalty case.  There was no shackling at the guilt phase, but the defendant appeared in shackles at the penalty phase, and there was no inquiry establishing the necessity of shackles.  The trial and direct appeal had occurred before <u>Deck</u> was handed down.  In 2002, the Florida Supreme Court denied post-conviction relief.  Like most pre-<u>Deck</u> decisions, that ruling addressed the claim of ineffective assistance for failure to object to shackling solely by finding no prejudice.  <u>Marquard v. State</u>, 850 So.2d 417, 431 (Fla. 2002).  The primary issue in federal habeas, therefore, was the retroactivity of <u>Deck</u>'s holdings that (1) unnecessary shackling at the penalty phase violated the Fourteenth Amendment and (2) its harmlessness must be established beyond a reasonable doubt.  The Eleventh Circuit rejected Marquard's claim of ineffective assistance for three reasons.  The first two grounds—<u>Deck</u> is not retroactive and counsel were not ineffective for failure to anticipate <u>Deck</u>'s extension of the shackling ban to the penalty phase—do not resolve Stephenson's claim because Stephenson appeared in the stun belt at the guilt phase of his trial.  The Eleventh Circuit also offered a third ground.  The habeas court concluded that in a direct appeal <u>Deck</u> shifted the burden to the state to prove harmlessness of shackling without a specific-needs inquiry, but <u>Deck</u> "did not address, much less alter, the burden and different required prejudice showing on Marquard's IAC shackling claim."  <u>Marquard</u>, 429 F.3d at 1313.  As a result, the defendant had the burden to establish prejudice under the <u>Strickland</u> standard.

---

[5] <u>In re Jasso</u>, No. H029756, 2006 Cal. App. LEXIS 1382, at *25 (Cal. Ct. App. 2006), was initially published but was ordered unpublished by the California Supreme Court.  2006 Cal. LEXIS 14200 (Nov. 29, 2006).  <u>Jasso</u> was not a death penalty case and therefore addressed prejudice only as to the finding of guilt.  The defendant, without objection from his counsel, appeared in shackles wearing a white prison jumpsuit with bold writing on the back identifying him as a prisoner.  <u>Id.</u> at *10.  In reviewing the denial of habeas alleging ineffective assistance, the court concluded that failure to object to shackles and jail garb fell "below an objective standard of reasonableness . . . under prevailing professional norms."  <u>Id.</u> at 25 (internal quotation marks and citation omitted).  The court also found the omission prejudicial, reasoning that the effect of the jumpsuit and shackles on the jury's perception of the defendant and the effect on the defendant's demeanor created a reasonable probability of a different result.  <u>Id.</u> at *32.  Relying on <u>Deck</u>, the court concluded that "had counsel objected and the objection erroneously been denied, our review would have governed by the stringent harmless-error standard for federal constitutional errors . . . and the state would have had to prove beyond a reasonable doubt that the shackling and jumpsuit did not contribute to the verdict."  <u>Id.</u> at *24-*25.

16

The law at the time of Marquard's direct appeal would not have supported either his claim of error for unnecessary shackling at the penalty phase or a claim of ineffective assistance of counsel for failure to object to shackling at the penalty phase. It is clear that lack of retroactivity does not bar Stephenson's ineffective assistance claim at the guilt phase. The novel proposition in Deck was that shackling during the death penalty phase violates the Fourteenth Amendment. At the time of Stephenson's trial, the points relevant to the guilt phase were already established law: unnecessarily shackling at the guilt phase of trial (or at trial in a non-death case) violates the Fourteenth Amendment; jail garb is "inherently prejudicial"; and the State bears the burden of proving beyond a reasonable doubt that an inherently prejudicial practice had no effect on the determination of guilt or the penalty. In short, the principles set forth in Deck that are relevant to Stephenson's case were all established by earlier precedent. Marquard therefore did not directly address the situation we have before us, where Stephenson's stun belt at the guilt phase required a specific-needs inquiry under the law in place at the time of his trial and direct appeal. We nevertheless think Marquard is correct that Strickland governs the prejudice prong of Stephenson's claim of ineffective assistance for failure to object to shackling.

d. *Prejudice*

If the issue of shackling at the guilt phase had been preserved at trial and raised on direct appeal, we would have been compelled to address that claim under the standard of Chapman v. California, 386 U.S. 18 (1967), and the burden would have been on the State to establish lack of prejudice beyond a reasonable doubt. But Strickland v. Washington places the burden of establishing prejudice on the petitioner in an ineffective assistance claim. The critical issue is therefore whether Stephenson established a reasonable probability that his counsel's failure to object to Stephenson's stun belt affected the result in either the guilt or penalty phase.

The State principally relies on Stevens v. State, 770 N.E.2d 739 (Ind. 2002), as establishing lack of prejudice from Stephenson wearing the belt at trial. That case, however, is inapplicable here because at least several of Stephenson's jurors were aware of the belt. In Stevens, we found no ineffective assistance for counsel's failure to object to the defendant's wearing a stun belt. The defendant had conceded that none of the jurors were aware that he was wearing the stun belt but argued that their perception of him was affected by his behavior and appearance as a result of the restraint. Id. at 757. The defendant argued that he appeared "withdrawn, subdued,

17

and unusually silent, which may have influenced [the jury] to recommend the death penalty." Id. Applying a pre-Deck standard of review, we affirmed the post-conviction court's finding that under the facts of that case the outcome would not have been different if there had been an objection. Id.

In French v. State, supra, we held that a defendant who wore handcuffs, shackles, and jail clothing at his habitual offender proceeding could not show he was prejudiced by counsel's failure to object because "it seem[ed] clear that the result of the proceeding was not affected by counsel's performance." 778 N.E.2d 816, 826. The issue in the habitual offender proceeding was whether the defendant had two prior felony convictions. He had already been convicted by the same jury of the underlying offenses, so it was no surprise that he was incarcerated. Moreover, as to the only issue—his two prior convictions—the evidence was "clear." Id. at 826.

Unlike French, Stephenson's failure to prove a reasonable probability of a different result does not rest on essentially indisputable evidence that establishes the merits of his conviction and sentence.[6] Rather, Stephenson has shown no prejudice because he has not shown a reasonable

---

[6] There was less than a conclusive amount of physical evidence connecting Stephenson to the crime. See Stephenson v. State, 742 N.E.2d 463 (Ind. 2005). Much of the evidence against Stephenson came from the testimony of Dale Funk, who claimed to be with Stephenson at the time of the killings, and Brian Mossberger, who produced the murder weapon when the police questioned him about the murders. The testimony of these two witnesses was largely consistent. It is clear that if Funk's and Mossberger's testimony is credible, the guilty verdict is sustained. The following is their trial testimony in chronological order of the events.

Funk testified that approximately two days before the killings he and Stephenson visited the mobile home occupied by Southard and her fiancé Troy Napier. According to Funk, Stephenson entered the unoccupied home and returned with ammunition. The three victims were killed on March 28, 1996. Funk testified that he and Stephenson arrived at Mossberger's house the evening of March 28. Stephenson went in to another room to talk with Mossberger while Funk remained at the kitchen table. According to Mossberger, he and Stephenson were talking when the Tylers and Southard briefly pulled into Mossberger's driveway in a pick-up truck. Mossberger testified that Stephenson said, "there goes Jay and I've got to catch him." Stephenson, 472 N.E.2d at 470. Funk testified that while he was sitting at the table, Stephenson returned to the kitchen "walking pretty fast" and called to Funk, "if you're coming, come on." According to Funk, Funk accompanied Stephenson in Stephenson's car as Stephenson pursued the Tyler truck through Warrick County rural roads until it stopped at an intersection. Id. Stephenson pulled up behind the truck and Tyler opened his front door and leaned out, looking back at Stephenson. Id. At that point Stephenson grabbed his SKS assault rifle, left the car, and began firing at the Tyler truck. Id. Stephenson then returned to the car, drove around the corner, stopped the car, and proceeded on foot in the direction of the Tyler truck. Stephenson returned a few minutes later and told Funk, "You breathe a word of this and I'll kill you." Id. at 470-71. Mossberger testified that after Stephenson and Funk returned to Mossberger's house, Stephenson was holding a knife with "red smears" on the blade and told Mossberger that "Jay, Kathy, and Brandy are no more." Id. According to Mossberger, Stephenson washed his knife in the kitchen sink and instructed Mossberger to "do something with the SKS; get rid of

probability that an objection, if made, would have been successful in the trial court, or would have produced the basis for a successful appeal.

Stephenson contends that wearing the stun belt "interfered with his right to communicate with counsel and participate in his own defense." The arguments of the parties and the post-conviction court's findings with respect to the stun belt were focused on this Court's opinion in Wrinkles. The findings with respect to the belt in their entirety were:

> At the time of the trial of this matter, it was not impermissible for the electronic restraint belt to be worn by Stephenson during the trial. The belt was never activated while on Stephenson, he was not prevented from assisting counsel while wearing the belt, and the same was a suitable and discreet alternative to other methods of restraint for Stephenson while he was on trial on multiple counts, including three counts of murder, in this case. The use of the belt was accepted by Stephenson and his counsel without argument or objection on the record during the trial proceedings.

Insofar as ineffective assistance claims were based on the belt, the post-conviction court found:

> As previously included in other findings of fact, it was the Warrick County Sheriff's Department who obtained and placed the electronic restraint on Stephenson and beneath his clothing. Judge Campbell did not order this to be done, and trial counsel did not argue or object to this restraint, as compared to other forms of restraint which may have been required otherwise. At the time the Defendant was required to wear the electronic restraint, he was on trial for triple murder, and facing a death penalty request by the State of Indiana. The law had not yet ruled the use of such devices on a criminal Defendant to be improper or violative of a Defendant's rights. In view of all the circumstances surrounding this case and this Defendant, including the extremely violent nature of the murders committed, the use of the electronic restraint belt was warranted, reasonable and necessary under these circumstances.

---

it; make it gone." Id. Funk also testified that he was present when Stephenson handed the weapon to Mossberger and told him to get rid of it. Id. Mossberger testified he buried the rifle and ammunition in the woods the next day but retrieved them two days later and placed them in his garage. Id. When the police officers arrived at Mossberger's house to question him later that day, he related his version of the events of the day of the murders and showed the officers the rifle but not the ammunition. Id.

On the morning of Friday, March 29, police found the bodies of the Tylers and Southard dead from gunshot wounds and stab wounds. Id. The forensic evidence was: (1) the fatal bullets were those fired from the SKS assault rifle that Stephenson owned but was in Mossberger's possession two days after the murders; (2) spent shell casings at the scene matched ammunition discovered in Southard's and Napier's mobile home; and (3) Funk's shoe prints, but not Stephenson's, were found at the mobile home. No other physical evidence connected Stephenson to the murders. The knife used in the murders was never recovered. Id.

The post-conviction court concluded that "counsel for Defendant was not ineffective because of failure to object to the use by the sheriff of the electronic restraint device on Stephenson during trial."

We take these findings and conclusions as a finding that the trial court would have overruled any objection to the belt that counsel had raised. These three murders were contended by both the defendant and the prosecution to have been related to organized drug activity. The murders appeared to have been premeditated and had characteristics of an assassination. There was testimony that the defendant had threatened to kill a critical witness. Under all these circumstances, the post-conviction court's finding is not clearly erroneous. Indeed, given the state of the law in 1996, we think it plain that the trial judge would have followed the sheriff's recommendation and ordered that the belt be deployed at the guilt phase even if defendant's counsel had objected and required a hearing and findings as to the need for its use. Because at the time shackling at the penalty phase was less controversial, the same result would have obtained at the penalty phase. Given the fact-sensitive nature of that order, under the circumstances the issue would not have presented a persuasive ground for appeal. The standard of review on appeal would have been abuse of discretion. Bivins v. State, 642 N.E.2d 928, 936 (Ind. 1994); Evans v. State, 571 N.E.2d 1231, 1238 (Ind. 1991). Accordingly, Stephenson has not established a reasonable probability of a different result from counsel's performance with respect to the belt at the guilt phase.

C. *Appellate Counsel's Failure To Raise an Issue over the Belt*

Although Stephenson asserts claims of ineffective assistance of appellate counsel, the failure to raise any issue of the belt on direct appeal is not among them. Stephenson contends that appellate counsel were unaware of the belt and correctly points out that there is no mention of the belt in the trial record. He claims that had appellate counsel known of the belt's use the issue would have been raised on appeal. We think that this circumstance raises no issue of appellate ineffectiveness.

The performance of appellate counsel is not substandard for failure to assert an issue on appeal if the issue is not revealed by the record and there is no evidence suggesting that appellate counsel were otherwise made aware of it. We have observed that "the Supreme Court of the United States has never suggested that [appellate] counsel must look outside the record for pos-

sible claims of error for the performance to be constitutionally effective." Woods v. State, 701 N.E.2d 1208, 1221 (Ind. 1998). We agree with those courts that have refused to impose such a burden on appellate counsel. Id. at 1221-22 (citing Kitt v. Clarke, 931 F.2d 1246, 1249-50 (8th Cir. 1991)). Thus, we concluded in Woods that "[b]ecause there is no constitutional requirement for appellate counsel to search outside the record for error, an ineffective assistance of appellate counsel claim that is in substance a trial counsel claim requiring extrinsic evidence may be dead on arrival." Id. at 1222. A corollary of this conclusion is that it is incumbent upon trial counsel to communicate to appellate counsel any matters outside the record that are appropriate for direct appeal. If supplementation of the record is required, Indiana procedure allows for it,[7] but we think the performance of trial counsel, not appellate counsel, is the only issue when nothing in the record suggests the issue.

In sum, to the extent Stephenson presents a claim for post-conviction relief based on the use of the stun belt at trial, that claim is one of ineffective assistance of trial counsel for failure to object, failure to preserve the issue for appeal, and failure to communicate the circumstance to appellate counsel. All of these omissions lead to the same result: they had no effect on the ultimate result of the trial.

## II. Other Ineffective Assistance of Counsel Claims

Stephenson raises a number of claims of ineffective assistance that are unrelated to the stun belt.

### A. *Failure To Impeach Witness*

At trial, Stephenson contended that three witnesses, his ex-wife, Dawn Krantz; Krantz's neighbor, Roxanne Lester; and Stephenson's friend, Julie Girtman, established that he could not have committed the murders in Warrick County between 9:50 and 10:00 pm on March 28 as alleged by the State.[8] The claim of ineffective assistance turns on failure to impeach Crystal

---

[7] See Hatton v. State, 626 N.E.2d 442 (Ind. 1993); Davis v. State, 267 Ind. 152, 368 N.E.2d 1149 (Ind. 1977).

[8] Krantz, testified that Stephenson had been with her the night of the murders. Specifically, she testified that she had been at Lester's house in Rockport when Stephenson arrived at approximately 10:45 or 10:50 pm that Thursday evening. Lester also testified that Stephenson "came over about 10:30." Girtman testified that Stephenson had stopped by her house in Rockport for about twenty-five minutes shortly after 10 pm that night. The distance in miles or driving time between Rockport, in Spencer County, and the site where the victims were found does not appear in the record.

Carter, a witness who contradicted Krantz on a point unrelated to Stephenson's alibi. Stephenson argues this undermined Krantz's credibility on the alibi. Krantz testified that Stephenson took her to work the following Sunday, March 31, 1996, and that she did not see him again until after he surrendered to the authorities on April 3, 1996. Whether Krantz and Stephenson saw each other between noon on March 31 and April 3 appears to be insignificant in itself. However, Carter, a friend and co-worker of Krantz, testified to having seen Krantz and Stephenson together on the night of March 31. Stephenson contends that his attorneys failed to impeach Carter and, as a result, rendered ineffective assistance. The post-conviction review court rejected this claim, and so do we.

Carter's initial testimony was consistent with Krantz's. In her first appearance on the stand, Carter testified that she had not seen Stephenson from the day of the killings through the end of March. After her initial testimony, Carter called defense counsel Long and told him that she had in fact seen Stephenson on March 31 in Owensboro, Kentucky, which is on the Ohio River across from Spencer County, Indiana. Long notified the court, and Trooper Marvin Heilman immediately interviewed Carter. In a recorded statement, Carter said that she had not seen Stephenson on March 31, which was consistent with her prior testimony. When recalled by the State, however, Carter testified that she had called attorney Long to change her story because she "thought the truth should come out." Carter then testified that she and Krantz had seen Stephenson in Owensboro the night of March 31. Carter testified that Stephenson was driving Girtman's car and flagged Carter and Krantz down as they were driving home from Wal-Mart.[9] Carter pulled over, and Stephenson and Krantz exited their vehicles and spoke while Carter remained in her car. Carter could not hear what was said between the pair but testified that after they spoke they both got into Carter's car and told her to drive to a gas station in Owensboro. En route Krantz and Stephenson talked, but Carter remembered, "[j]ust that [Stephenson] was upset about something about a gun." At the gas station, Krantz and Stephenson left the car, and Krantz returned to the car about ten minutes later. According to Carter, Krantz told her "not to say nothing."

Stephenson contends that Krantz's credibility was "crucial to his defense" and was undercut by Carter's testimony. Stephenson contends that trial counsel was ineffective for failure

---

[9] Carter testified that she and Dawn Stephenson had worked the same shift on Sunday, March 31, 1996, and upon getting off work around 10 pm, Carter drove the two of them to Wal-Mart in Owensboro.

to impeach Carter with the prior inconsistent statement given in her recorded interview with Officer Heilman. It is true that Carter's final version contradicted Krantz on a point unrelated to Stephenson's alibi. But failure to impeach Carter with the taped statement she made to Trooper Heilman did not render counsel ineffective. First, the jury had already heard Carter's earlier denial of any contact with Stephenson after the killings. The same statement to Heilman added nothing to the inconsistency already in the record. Second, in an eight-month trial, some oversights are inevitable, and this episode in isolation does not render counsel's overall performance substandard. Smith v. State, 272 Ind. 216, 218, 396 N.E.2d 898, 900 (1979). Third, in Carter's second appearance on the stand, she elaborated on her recollection of the conversation between Krantz and Stephenson in the car in Owensboro. She said she heard Stephenson refer to the gun while talking to Krantz and say, "I loaned it to a buddy, and all hell's broke loose." This supported Stephenson's basic defense that others had been the killers. For that reason, embracing, rather than attacking, Carter's account was a reasonable judgment on the part of the defense. For all these reasons, failure to introduce the statement to Heilman was neither substandard nor prejudicial.

B. *Lack of Knowledge of Law Regarding Stephenson's Statement to Police*

Stephenson gave a voluntary statement to the police two days after the murders. Stephenson argues that he was denied the effective assistance of counsel when counsel failed to attack or mitigate the effect of this statement due to counsel's mistaken belief that the statement would not be admitted into evidence. The statement is in itself not particularly significant. The defense's theory of the case was that on the night of the killings Stephenson went first to Mossberger's house in Warrick County, next saw the victims at a Circle S convenience store, and then proceeded to his home in Rockport in adjacent Spencer County. In a police interview on March 30, 1996, Stephenson had given the officers a different sequence. He said that he saw the victims at the Circle S convenience store, then drove by Mossberger's house, and on to Rockport.

The defense theory obviously conflicted with Stephenson's statement to police as to the sequence of these events. As Stephenson sees it, the conflict was damaging to his credibility. Stephenson contends that at the time of the statement he was intoxicated and for that reason mistaken about the chain of events. He contends that expert testimony could have bolstered this claim. At post-conviction Stephenson produced Dr. Robert Smith, an expert in chemical de-

pendency, who testified that in his opinion Stephenson's intoxication on March 30 impaired Stephenson's ability to recall the sequence of events on the night of the murders. Stephenson now contends counsel mistakenly believed that the intoxication would preclude admitting his statement to police as evidence at trial. He argues that if counsel had understood that the statement was admissible, they should have prepared to mitigate the harm of the statement by challenging its reliability through the use of an expert such as Dr. Smith.

At post-conviction Stephenson pointed to two legal errors in his counsel's conclusion that the statement to police was inadmissible. Long testified that he "should have" challenged the statements based on intoxication. This seems unlikely to have succeeded. Generally, intoxication or mental impairment do not render a statement made by a defendant involuntary per se. Crain v. State, 736 N.E.2d 1223, 1232 (Ind. 2000). These factors go to the weight of the statement, not to its admissibility. Id. The evidence shows Stephenson was drinking beer, but nowhere near the stage of intoxication required to exclude the statements.[10]

Trial counsel Vowels offered a second ground for his belief that the statement was inadmissible. He testified at post-conviction review that counsel thought the tape of Stephenson's statement had been lost and that "under the Rules of Evidence, 8, 900 series, they couldn't authenticate the transcript. So up to that point, we had a shot of winning because they couldn't account for Mr. Stephenson's whereabouts and all they had was Mr. Mossberger and Mr. Funk's say so that John Stephenson was the shooter." Under Boyd v. State, 430 N.E.2d 1146, 1148 (Ind. 1982), however, the interrogating officer's testimony that the transcript accurately reflected the conversation is sufficient for admissibility of the transcript even though the tape was lost.

---

[10] Detective Gary L. Gilbert and Investigator Michael E. Hildebrand, both of the Indiana State Police, took the statement. They testified at trial outside the presence of the jury and at post-conviction review that Stephenson was drinking beer as he gave his statement to the officers on March 30, 1996. Both officers, however, testified that Stephenson did not appear intoxicated. Trooper Gilbert testified that Stephenson "seemed to be aware of time and place. He seemed to understand our questions. And I didn't detect any kind of slurred speech or anything of the nature—any kind of impairment." Likewise, Officer Hildebrand testified that "he appeared to be coherent, understood our questions, and answered those in a relevant way." Furthermore, at post-conviction review, Trooper Gilbert testified that he had received training over the years as a trooper concerning the recognition of an intoxicated individual, and that in his opinion Stephenson "seemed to be in full control" and that as he understood it, Stephenson gave a truly voluntary statement on his part. Gilbert also testified that, although it is unusual for a suspect to give an interview while he is drinking, "in this particular case [Stephenson] indicated that it'd make him feel more relaxed and I felt like he might be more open and honest with us if we're not going to try and make him defensive and tell him what he can and cannot do in his own home."

We agree with Stephenson that his trial counsel's faith in excluding the statement was misplaced. But we do not agree that this error had any significant effect on the trial. The evidence was admissible whether or not counsel correctly assessed its admissibility. The only issue is whether it could have been effectively contested by expert testimony. The claim that beer can cause memory to be somewhat impaired, particularly as to details that seem insignificant, is one that jurors can assess. We think there is no reasonable probability that failure to produce an expert on this subject had any material effect on the trial.

C. *Lack of Pretrial Investigations*

Stephenson contends that his trial attorneys neglected to present any mitigating evidence at the penalty phase and that this was both substandard performance and prejudicial. Specifically, Stephenson argues that trial counsel inadequately investigated Stephenson's prior offenses and failed to interview key witnesses who would have testified to either Stephenson's character or his past good deeds, including saving one person from drowning. The State responds that trial counsel's pre-trial investigation was sufficient; the decisions on what evidence to present were strategic choices made after thorough consideration; and even if there were deficient performance, Stephenson cannot show any prejudice or that the result would have been different. The post-conviction court found that mitigating evidence "could have been more thoroughly developed and investigated" but ultimately concluded that

> under all the circumstances of this case, including counsel's knowledge of Stephenson's prior criminal convictions, including but not limited to his shooting of a loaded firearm into an occupied residence years before, counsel's decision not to open up Stephenson's background to allow such evidence to be presented to the jury by the prosecution during the death penalty phase of the trial cannot be said to be unreasonable or irrational, or ineffective assistance of counsel.

The record supports this finding. Trial counsel testified persuasively that placing Stephenson's character in issue would open the door to rebuttal evidence of Stephenson's significant criminal history. Additionally, at the post-conviction hearing, Stephenson's ex-wife testified that Stephenson had physically abused her and on one occasion had beaten her so severely that she was hospitalized. Vowels testified that he was also concerned that the jury would learn of Stephenson's conviction for shooting into an occupied dwelling in Virginia and a battery charge alleging Stephenson struck a man with a shovel in Newburgh. Vowels testified, "I made a decision of strategy and I employed it." The post-conviction court found that trial counsel's decision

not to offer evidence of Stephenson's character was not unreasonable in view of the considerable negative evidence that Stephenson's character evidence would have produced. We agree.

Stephenson cites Rompilla v. Beard, 545 U.S. 374 (2005), in support of his claim that counsel's investigation of his past was ineffective. Rompilla's sole presentation in the penalty phase under the Pennsylvania death penalty statute consisted of testimony from five members of his family who begged for mercy. His son testified that he loved his father and would visit him in prison. Stephenson argues that the effort of Rompilla's attorneys, which was found ineffective, far exceeded Stephenson's trial counsel's performance.

We do not find Rompilla controlling here. In Rompilla, the aggravating circumstance rendering the defendant eligible for the death penalty under Pennsylvania law was "a significant history of felony convictions involving the use or threat of violence to the person." 545 U.S. at 383. Rompilla's counsel was found ineffective for failure to investigate the circumstances of Rompilla's prior convictions to determine whether they involved the use of violence. The Supreme Court of the United States found that it was clear that Rompilla's trial counsel knew of the Commonwealth's plan to parade the details of the prior crime before the jury. Id. Rompilla's prior conviction file was a public document, "readily available for the asking at the very courthouse where Rompilla was to be tried." Id. at 384. The Court reasoned

> It is difficult to see how counsel could have failed to realize that without examining the readily available file they were seriously compromising their opportunity to respond to a case for aggravation. The prosecution was going to use the dramatic facts of a similar prior offense, and Rompilla's counsel had a duty to make all reasonable efforts to learn what they could about the offense. Reasonable efforts certainly included obtaining the Commonwealth's own readily available file on the prior conviction to learn what the Commonwealth knew about the crime, to discover any mitigating evidence the Commonwealth would downplay and to anticipate the details of the aggravating evidence the Commonwealth would emphasize.

Id. at 385-86.

In Stephenson's case, the omitted investigation and testimony all related to mitigation, not to proof of an aggravating circumstance necessary for eligibility for the death penalty. As a result, in Stephenson's case the concern for opening the door to offsetting evidence is a proper, indeed necessary, consideration. This presents an entirely different situation from Rompilla. Defeating an eligibility aggravator avoids the death penalty. Establishing some mitigating char-

acter evidence does not close a door, and it can open one. That judgment is one in which counsel's choice is entitled to deference.

### D. *Ineffective Appellate Counsel*

A claim of ineffective assistance of appellate counsel is analyzed under the same standard of review as for trial counsel. Lowery v. State, 640 N.E.2d 1031, 1048 (Ind. 1994). Stephenson contends that his appellate counsel provided ineffective assistance by failing to raise three properly preserved issues. Stephenson also contends that this Court rendered his appellate counsel ineffective by limiting his brief to 28,000 words as provided by Appellate Rule 8.2.

Stephenson's claim that counsel failed to raise his right to present a defense involves the trial court's denial of Stephenson's request to produce notes of investigating officers.[11] According to Stephenson, one of the notes indicated that law enforcement officers knew that the "multitude of vehicles" at Napier's and Southard's house was connected to Napier's drug-dealing. The defense contends that the three killings were related to Napier's drug operation. Stephenson submits that the officers' notes were exculpatory of Stephenson and inculpatory of others. The post-conviction court found that "the materiality of this information appears marginal or speculative at best." We agree. Stephenson contended that the deaths were drug related. Knowledge that the officers suspected Napier of dealing does not exculpate Stephenson. These notes reflect suspicions, not evidence. And even evidence that Napier was a dealer would not suggest that Stephenson was innocent of these murders.

The trial court denied Stephenson's request to question Herschel Siefert in front of the jury. Stephenson argues that appellate counsel was ineffective for failure to raise this issue on appeal. Near the end of trial, trial counsel learned of a witness who claimed to have been in jail with Seifert and Jimmy Knight and to have overheard them conversing about the murders, specifically why Siefert ordered the killings. Other witnesses claimed to have overheard similar statements from Siefert and Knight. Seifert had been arrested on federal drug charges and was being detained in Vanderburgh County. Siefert was called by the defense outside the presence of

---

[11] The post-conviction court points out that the trial court ordered "certain portions of the notes disclosed to the defense" and that Stephenson alleges that one not disclosed to the defense indicated that a Troy Napier was trading dope for cars. Stephenson contends that had the defense known this fact, trial counsel would have investigated the vehicles located at the residence and such investigation could have led to the existence of other suspects or other information that was exculpatory as to Stephenson.

the jury. When the defense asked Seifert if he ordered the three killings, Seifert invoked his Fifth Amendment rights. The trial judge then denied trial counsel Long's request to question Seifert in front of the jury. The trial court held testimony of witnesses claiming to have heard incriminatory statements was admissible as statements against his penal interest.

Stephenson claims that appellate counsel should have raised the issue that failure to allow the defense to force Siefert to invoke his right before the jury was reversible error. This contention fails because defendants do not have a right to force a witness to invoke the Fifth Amendment privilege before the jury. See United States v. Castorena-Jamie, 285 F.3d 916, 931 (10th Cir. 2002) ("The district court did not abuse its discretion by refusing to allow the Defendants to compel Castorena to appear before the jury simply to invoke his Fifth Amendment rights."); Bowles v. United States, 439 F.2d 536, 541 (D.C. Cir. 1970).

Stephenson contends that appellate counsel were ineffective for failure to raise the issue that, "[o]ver defense objection, prospective jurors were excused because of their religious beliefs." This is based on the State's excusing for cause jurors who affirmed they would not consider recommending the death penalty. According to Stephenson, Indiana Code section 35-37-1-5(a)(3),[12] which allows such exclusion, "suppressed those prospective jurors' rights to practice their religion." He also contends that exclusion of jurors on this ground violates the equal privileges provision found in Article I, section 23 of the Indiana Constitution. We rejected this contention in Ben-Yisrayl v. State, 753 N.E.2d 649, 655 (2001) and adhere to that view. Accordingly, appellate counsel were not ineffective for their decision not to raise these issues on appeal.

Stephenson further claims that appellate counsel failed to challenge the reasonable doubt instructions as erroneous. Specifically, Stephenson disagrees with the instructions in both the guilt and penalty phase which define reasonable doubt as "a fair, actual, and logical doubt that arises in your mind . . . . " According to Stephenson "use of the verb 'arise' in the instruction violated Stephenson's rights under the United States Constitution" because "requiring the evidence to generate reasonable doubt places an unconstitutional burden on the defendant to prove his innocence or his claim for life . . . ." Stephenson also claims appellate counsel should have challenged the instruction that "if the State failed to prove each of these elements beyond a rea-

---

[12] Indiana Code section 35-37-1-5(a)(3) (2004) in pertinent part states that it is a good cause to challenge a prospective juror "if the state is seeking a death sentence, that the person entertains such conscientious opinions as would preclude the person from recommending that the death penalty be imposed."

sonable doubt, you should find the Defendant not guilty . . . ." Stephenson argues that "should" instead of "must" in this instruction allowed a jury to find him guilty on less than a reasonable doubt. This court has previously held these same instructions proper. See Ben-Yisrayl, 738 N.E.2d at 265. We think it plain that many more issues would have presented a greater prospect of success on appeal. None of these instruction errors was raised at trial and none approaches "fundamental error" permitting it to be raised even if not preserved at trial.

Finally, Stephenson claims that this Court rendered appellate counsel ineffective and disallowed meaningful appellate review by the briefing limitations and time limitations it placed on appellate counsel. This claim is not supported by pointing to any argument that was omitted from the one hundred page revised brief. Stephenson's appellate counsel initially filed a 152 page brief without permission to exceed the fourteen thousand words or thirty pages allowed by the appellate rules. We ordered re-briefing in compliance with the rule at that time which granted this court discretion to permit a party to increase the number of pages to exceed the designated number. See Appellate Rule 8.2 (1998).

The post-conviction court rejected all of these claims and found that based on Strickland, "Stephenson's evidence, including but not limited to the testimony of [appellate counsel] at the PCR hearing, does not prove by a preponderance of the evidence the ineffectiveness of appellate counsel . . . ." The post-conviction court observed "appellate counsel raised all issues they believed were meritorious" and that according to Jones v. Barnes, 463 U.S. 745 (1983) the post-conviction court held "appellate counsel need not raise every issue that presents itself for appeal, and counsel is permitted to choose the strongest issues for argument and omit others." We agree.

### III.  Newly Discovered Evidence at Post-Conviction Review Proceeding

Stephenson argues that he presented previously undiscovered evidence that requires the vacation of his convictions and death sentence. The evidence he cites was presented at the post-conviction review proceeding and also in a Verified Supplement to Motion to Correct Errors filed after the denial of post-conviction relief. Stephenson challenges the standard used by the post-conviction court to assess this evidence. He also contests the post-conviction court's summary denial of his Verified Supplement to Motion to Correct Errors.

29

A. *Standard for Claims of Newly Discovered Evidence*

The familiar standard for determining whether new evidence mandates a new trial requires that

> (1) the evidence has been discovered since the trial; (2) it is material and relevant; (3) it is not cumulative; (4) it is not merely impeaching; (5) it is not privileged or incompetent; (6) due diligence was used to discover it in time for trial; (7) the evidence is worthy of credit; (8) it can be produced upon a retrial of the case; and (9) it will probably produce a different result at retrial.

See, e.g., Carter v. State, 738 N.E.2d 665, 671 (Ind. 2000). Applying this frequently cited nine-factor test, the post-conviction review court determined that "[t]he newly discovered evidence offered by Stephenson is largely cumulative, is not worthy of credit, and probably would not produce a different result at a retrial of this case." This finding was entered on May 12, 2003.

Stephenson contends that this nine-factor test is no longer appropriate in a death penalty case after the addition of subsection (k) to Indiana's death penalty statute. That subsection, Indiana Code section 35-50-2-9(k), became effective on July 1, 2003. It provides:

> A person who has been sentenced to death and who has completed state post-conviction review proceedings may file a written petition with the supreme court seeking to present new evidence challenging the person's guilt or the appropriateness of the death sentence if the person serves notice on the attorney general. The supreme court shall determine, with or without a hearing, whether the person has presented previously undiscovered evidence that *undermines confidence in the conviction or the death sentence*. If necessary, the supreme court may remand the case to the trial court for an evidentiary hearing to consider the new evidence and its effect on the person's conviction and death sentence. The supreme court may not make a determination in the person's favor nor make a decision to remand the case to the trial court for an evidentiary hearing without first providing the attorney general with an opportunity to be heard on the matter.

I.C. § 35-50-2-9(k) (emphasis added).

Stephenson argues that subsection (k) establishes a new, less onerous, standard for analyzing evidence discovered after the completion of post-conviction review proceedings in capital cases. Stephenson also contends that although subsection (k) by its terms addresses new evidence that arises after a capital defendant has pursued post-conviction relief, it would be unfair, unreasonable, and inefficient to impose a higher burden on a capital defendant presenting new evidence at a post-conviction review proceeding.

We agree that the legislature intended to establish a different standard for evidence discovered after post-conviction review in capital cases. Specifically, the statute means what it says: after the completion of post-conviction review proceedings in capital cases, this Court is to determine whether previously undiscovered evidence "undermines confidence in the outcome." I.C. § 35-50-2-9(k). We also agree that this standard is less burdensome than the nine-factor approach traditionally applied to claims of new evidence. The statute's reference to evidence that "undermines confidence" in the conviction uses the same language as the familiar standard announced in Strickland v. Washington, 466 U.S. 668, 669 (1984) for the prejudice prong of claims of ineffective assistance of counsel: "a reasonable probability . . . that the result of the proceeding would have been different." See Wrinkles, 749 N.E.2d at 1188-89. Under this standard, a "reasonable probability" is explained as one that "undermines confidence" and is established if the petitioner shows that the new evidence might reasonably have produced a different result. Strickland, 466 U.S. at 694. This standard requires less than a showing that the new evidence "will probably" produce a different result. Id. Moreover, the nine-factor approach used to evaluate newly-discovered evidence places a high value on finality of judicial resolutions. As a result, the nine-factor approach "is a rigorous one." Vacendak v. State, 264 Ind. 101, 108, 340 N.E.2d 352, 358 (1976). Subsection (k) applies only in death penalty cases. We assume it reflects the legislature's view that in those cases normal concerns for finality must yield to the public's interest in assuring that we do indeed reach the proper result, even at the cost of added delay, expense, and expenditure of judicial resources. See generally Gardner v. Fla., 430 U.S. 349, 357-58 (1997). The new statute undoubtedly reflects recognition that previously unavailable technology, principally DNA analysis, can produce evidence that drastically affects one's confidence in earlier convictions. Confidence in the result necessarily turns on evaluation of the evidence at trial in the light of the newly advanced material. The statutory standard of whether previously undiscovered evidence undermines confidence in the capital conviction therefore turns on the totality of the evidence, i.e. the previously undiscovered evidence in light of the evidence at trial. Cf. Strickland, 466 U.S. at 694 (stating that a court is to look at the "totality of the evidence" in an ineffective assistance of counsel claim when deciding whether counsel's errors were sufficient to undermine confidence in the outcome of the proceeding).

Stephenson concedes that he does not meet the literal terms of subsection (k) because he offers this evidence in the course of post-conviction review and not after the post-conviction pro-

ceeding has run its course. However, he argues that it would be arbitrary and inconsistent to impose a less onerous standard of review on a capital defendant based solely upon the point in time the capital defendant discovers new evidence. We agree with Stephenson that it would be unfair and pointless to impose a higher burden on a capital defendant seeking to present previously undiscovered evidence at a post-conviction review proceeding than would govern previously undiscovered evidence after the completion of post-conviction review. In other words, to the extent the evidence is truly "previously undiscovered,"—i.e. was not available at trial—it is of no consequence what point the capital defendant unearths it. A contrary holding would simply prevent consideration of the new evidence in conjunction with all other matters available in post-conviction review but require considering it in a subsequent proceeding. The result would be only delay and added expense. We conclude that the less burdensome standard set forth in Indiana Code section 35-50-2-9(k) applies to newly discovered evidence claims in capital post-conviction proceedings as well as to newly discovered evidence claims after the completion of capital post-conviction review.

The statute provides that the defendant must "present" evidence that is "previously undiscovered." We take this to place on the defendant the burden of showing that the proffered evidence was "previously undiscovered" and that it "undermines confidence" in either the guilt, the penalty, or both. We think "previously undiscovered" is functionally equivalent to "newly discovered" under Trial Rule 60(B). Thus, in order for Stephenson to meet the first and sixth requirements of the judicially created test for "newly discovered evidence," the evidence must be "discovered since the trial," and the defendant must have "used due diligence to discover it before trial." Cf. Fed. R. Crim. P. 33.[13]

B. *Application of Indiana Code Section 35-50-2-9(k) to Stephenson's Newly Discovered Evidence Claims*

The post-conviction review court applied the traditional nine-factor standard in evaluating Stephenson's claims of newly discovered evidence and summarily denied Stephenson's Veri-

---

[13] Evidence is "newly discovered" if the defendant shows that (1) the evidence has been "discovered since the trial" and demonstrates (2) "due diligence in discovering and presenting such evidence." John A. Glenn, What Constitutes "Newly Discovered Evidence" Within Meaning of Rule 33 of Federal Rules of Criminal Procedure Relating to Motions for New Trial, 44 ALR Fed. 13 § 5 (1979) (citing numerous federal cases).

fied Supplement to Motion to Correct Errors.  The statute directs this Court to reevaluate these claims under the more generous standard of "previously undiscovered evidence that undermines confidence in the conviction or death sentence."

Stephenson contends that the post-conviction testimony of several persons and a statement and a deposition taken after the denial of post-conviction relief are all "previously undiscovered evidence" undermining confidence in his convictions and death sentence.  Some of this evidence implicates other persons in the murders, and some, if credited, is exculpatory of Stephenson.  For the reasons explained below, we conclude that the majority of the offered evidence does not meet the standard of Indiana Code section 35-50-2-9(k) because Stephenson has not met his burden of demonstrating that the evidence is "previously undiscovered."

First, the findings by the post-conviction court are sparse and do not meet the requirements of Indiana Post Conviction Rule 1, section 6.  That section requires that a post-conviction court "make specific findings of fact, and conclusions of law on all issues presented."  In analyzing this rule, this Court has made clear that "[i]t is the duty of the trial judge to relate the facts on which he makes his determination (conclusion) that the petitioner is or is not entitled to the relief he seeks."  Davis v. State, 263 Ind. 327, 331, 330 N.E.2d 738, 741 (1975).  The Court analogized this rule with Trial Rule 52(A), the purpose of which "is to have the record show the basis of the trial court's decision so that on review the appellate court may more readily understand the former's view of the controversy."  Love v. State, 257 Ind. 57, 59, 272 N.E.2d 456, 458 (1971) (internal quotations marks omitted) (quoting Harvey, 3 Indiana Practice 426 (1970)).  The standard for reviewing a post-conviction court's failure to enter specific findings and fact and conclusions of law is a harmless error standard.  See Davis, 263 Ind. at 331, 330 N.E.2d at 741.

In evaluating Stephenson's claims of new evidence, the post-conviction court concluded

> Stephenson did not present any new material evidence to undermine the validity of his murder convictions.  Stephenson has failed to prove by a preponderance of the evidence that any newly discovered evidence might result in different verdicts against him.

> The newly discovered evidence offered by Stephenson is largely cumulative, is not worthy of credit, and probably would not produce a different result at a retrial of this case.  As the Supreme Court has previously stated, the basis for newly discovered evidence should be received with great caution and the alleged new evidence carefully scrutinized.  (citations omitted).

33

We find that the post-conviction court's lack of specific findings of fact or conclusions of law is harmless error in this case. Even if credited, the new evidence is basically consistent with the State's theory that Stephenson was at least one of the killers. Nothing in the new evidence contradicts or calls into question the testimony of Funk and Mossberger, whose credibility was the basis of the State's case.

Stephenson offers the post-conviction testimony of ten individuals as previously undiscovered evidence that implicates one Guy James "Jimmy" Knight. Stephenson also offers the testimony of two others who implicated Brian Mossberger, one of the two principal witnesses against Stephenson.

Only two of these twelve witnesses were asked in post-conviction review whether they had disclosed their post-conviction evidence to Stephenson's counsel. Danyel Renfro testified at trial. At the post-conviction review proceeding, Danyel Renfro offered testimony that Knight had threatened victim Brandy Southard shortly before she was murdered.[14] However, Renfro also testified that she had given all of this information to Stephenson's counsel before trial. Stephenson's brother, David, did not testify at trial. At post-conviction review, he testified that he had a conversation with Stephenson shortly before the murders and that Stephenson told him that Mossberger was in possession of the gun that was ultimately found to be the murder weapon.[15] David also stated that he disclosed this information to defense counsel at the time of Stephenson's trial.[16] Because it was available to the defense at trial, neither Renfro's testimony nor David Stephenson's testimony can be characterized as previously undiscovered. See Williams v. State, 793 N.E.2d 1019, 1023-24 (Ind. 2003).

Four other post-conviction witnesses (Becky Beasley, Becky Francis,[17] Brandi Martin,[18] and Carl Bruner[19]) testified at Stephenson's trial. Although some of their post-conviction testi-

---

[14] Renfro, who was "best friends" with victim Southard, testified at post-conviction review that Southard told her that Knight threatened Southard and was demanding a sum of money from Southard. Renfro also testified that Seifert indicated to her that he knew about the murders before they happened and that Knight was "crazy."

[15] There was no hearsay objection to this testimony.

[16] David Stephenson stated that he talked with Stephenson's counsel about the subjects he discussed at post-conviction review, but he thought he talked about the subjects in greater detail at post-conviction review. He answered affirmatively when asked whether he would have revealed all of the information to Stephenson's counsel at the time of trial if questioned by Stephenson's counsel.

[17] Becky Francis testified that Seifert was upset about some "dope" that was missing for which victim Southard was responsible and that Seifert told Knight to "take care of the situation." Francis also testified

34

mony was not presented at trial, we cannot conclude that any of the post-conviction additions to their trial testimony fall into the category of "previously undiscovered evidence." Stephenson has made no showing that the evidence was discovered since trial or that he or his counsel exercised due diligence to elicit this testimony. The requirement of due diligence includes a showing of why the evidence was unavailable if the witnesses were known to the defense. Without some showing of intentional withholding by the witness, a person who testifies at trial can be assumed to have been available for whatever exploration is appropriate. Similarly, if testimony was not elicited, without more it is reasonable to assume counsel made a decision not to open the subject. Stephenson makes no claim that any of these witnesses was prevented from presenting this evidence at trial. Nor is there any claim of active concealment by any of these four.

Six other post-conviction witnesses (Terri Greenlee West,[20] Christina Baker Barenfanger,[21] David Kifer,[22] David Stephenson, Chad Adams,[23] and Carla Smith[24]) did not testify at

---

that she expressed to Christina Barenfanger concerns that Knight was involved in the murders, Barenfanger relayed Francis's concerns to Knight, and soon after Knight came to Francis's house and confronted her. Francis claimed that Knight said "[a]nybody ever tells on me, they won't have to worry about dying theirselves, they'll watch every single person they care about die around them." She testified that she told her mother "everything" and that her mother contacted Stephenson's counsel. Francis's mother did not testify in post-conviction, and counsel were not asked about Francis's account of Knight's threats. It is unclear how much of Francis's story was given to Stephenson's counsel prior to trial. However, nothing from Francis's testimony suggests that she withheld any information from Stephenson's counsel.

[18] Brandi Martin testified that Southard told her that Knight had been threatening Southard. Martin also testified that victim Kathy Tyler told her that she was afraid and thought she was being followed. There is no indication from Martin's post-conviction testimony or from Stephenson's counsel that Martin withheld any of this information from Stephenson's counsel. Nor are we given any other explanation for its unavailability at trial.

[19] Carl Bruner stated that he gave a ride to Knight the morning of the trial and Knight stated something similar to "they went too far" or "somebody went too far." There is no indication from Bruner's testimony that he withheld any of this information from Stephenson's counsel.

[20] Terri Greenlee West testified that at the time of the murders, Becky Beasley, Jimmy Knight's girlfriend, was living with West. West claimed that the morning after the murders, Knight came to West's house to speak with Beasley outside and that Beasley came back into the house and was very upset about the murders. Beasley testified at PCR that she may have been living with West at the time of the murders, but she was not completely sure. West was not asked why she did not come forward with this testimony earlier, and there is nothing to indicate whether West was contacted by Stephenson's counsel prior to or during Stephenson's trial.

[21] Christina Barenfanger testified that she asked Knight if he was involved in the murders and he nodded affirmatively and winked at her. When Barenfanger was asked if she ever thought "about going to the police with what happened in the jail," Barenfanger responded, "No. I knew—I'd seen him in there going to court. I figured, I figured he was just messing with my head again which he had done, you know, a hundred times before. But I seen him on TV going to court for it. I figured if they didn't know then, then

Stephenson's trial. Stephenson has made no showing that the information they provided at post-conviction review was unavailable for trial. Thus, it cannot be considered "previously undiscovered evidence." In hindsight, one can argue that one or more of these witnesses should have been called to testify at Stephenson's trial. However, a great number of trial decisions or strategies are flawed in some respect in hindsight, and there is no charge of ineffective assistance based on failure to call any of them. Furthermore, even if counsel were not aware of these witnesses before trial, the statute requires diligence in discovering these witnesses and places the burden on Stephenson to show why their testimony was unavailable at trial. Stephenson offers nothing to discharge that burden.

Stephenson offers the testimony of two post-conviction witnesses that is "previously undiscovered evidence." Richard Dwayne Williams's testimony at trial implicated Knight and Herschel Seifert in the murders.[25] During post-conviction review, Williams testified that on two separate occasions after trial he was attacked and that he believed that the attacks were because of his trial testimony implicating Knight and Seifert in the murders. This testimony is plainly

you know." Barenfanger was not asked at PCR whether Stephenson's counsel contacted her prior to or during Stephenson's trial.

[22] David Kifer testified at PCR that he shared a jail cell with Knight and that after Knight testified at Stephenson's trial he came back to the jail and stated "Yeah, I know Stephenson didn't do that. But he's [a] hit." Kifer was not asked why he did not come forward with this testimony earlier, and there is nothing to indicate whether Kifer was contacted by Stephenson's counsel prior to or during Stephenson's trial.

[23] In a transcribed statement to the police in 2003, Chad Adams claimed that he was at a bonfire at Mossberger's house the night the murders took place. He stated that everyone was outside when the victims drove by the party, at which point Mossberger claimed "I'm gonna go catch that son of a bitch." Adams testified that after Mossberger returned Adams overhead Mossberger admitting to committing the murders to Stephenson. He explained why he had not come forward with this earlier. "I don't know, everybody just disappeared and everything and all I know is if anybody says that anyone other than John didn't do it they were doing to die."

[24] Carla Smith, Chad Adams's mother, testified in a deposition that Chad's ex-wife's cousin Donald Goodman told her that Goodman was attending the party at Mossberger's house and that Mossberger came into the house with "blood on himself" the day of the murders. Goodman also told Smith that Mossberger threatened Goodman and stated that Goodman "better keep his mouth shut" or he was "going to be next." This appears to be hearsay but was admitted without objection. Goodman did not testify. Carla Smith explained why she had not come forward earlier: "Just didn't want to get involved because I knew what this guy had done and, you know, I was just like mainly everybody else, you know, scared because I had a family too."

[25] Richard Dwayne Williams testified at trial that he was jailed in the same cellblock as Herschel Seifert and Jimmy Knight and that he overheard Herschel and Knight conversing about the murders. Specifically, Williams heard Herschel getting angry with Knight because Knight left his clip in the murder weapon and also because Herschel had advanced Knight a large amount of crank. Williams also heard Knight respond to Herschel that Herschel had no right to be upset because Herschel was the one who ordered the hit.

36

previously undiscovered evidence because it recounts events that took place after trial. A second post-conviction review witness, Robert Andrew Smith, had been called as a defense witness at trial but had refused to testify and was held in contempt of court and placed in solitary confinement. At post-conviction review, he testified for the first time that he heard Knight bragging about the murders. This is also "previously undiscovered evidence" because it could not be presented at trial despite defense counsel's diligent efforts.

Although this evidence is "previously undiscovered," it does not undermine confidence in Stephenson's outcome. The attacks on Williams could have been related to Williams's testimony at trial, but there is no basis to conclude that they were motivated by revenge for Williams's truthful trial testimony. It is equally plausible that the attacks were motivated by anger because Williams falsely implicated Knight. At post-conviction review, Smith testified to events that occurred seven years earlier and admitted that he "wasn't trying to hear half of what [Knight] was saying." More importantly, the prosecutor freely conceded that Knight and Siefert might have been involved in the murders but argued to the jury that only Stephenson's guilt was before them. Any pursuit of others was for the State to consider in the future. As we noted in Stephenson's direct appeal, the jury was presented with several witnesses' testimony implicating Knight and Seifert, and the jury chose to believe the State's evidence against Stephenson. Stephenson, 742 N.E.2d at 499. The additional testimonial evidence of Williams and Smith does not undermine confidence in Stephenson's convictions and death sentence.

## IV. Jury Bias

Stephenson challenges the post-conviction court's rejection of his claim that he was denied his right to an impartial jury because the jury was improperly exposed to a variety of extraneous, prejudicial influences. Specifically, Stephenson argues that (1) the jury foreperson's acquaintance with the victim's sister undermined the foreperson's ability to serve as a fair and impartial juror; (2) the foreperson's reading of pro-prosecution crime novels in the jury room during trial created an unacceptable influence that contaminated the verdict; and (3) some jurors' awareness of Stephenson's prior involvement in a fight was prejudicial. Stephenson argues that these singly and collectively deprived him of his Sixth Amendment right to a fair jury trial and his Fourteenth Amendment right to due process.

37

A. *Juror's Acquaintance with Victim's Sister*

Stephenson contends that jury foreperson Michael Fox's acquaintance with Kim Seibert, the sister of victim Kathy Tyler, undermined Fox's ability to remain fair and impartial. The right to a jury trial includes "a fair trial by a panel of impartial, indifferent jurors." Turner v. Louisiana, 379 U.S. 466, 471 (1965). In certain circumstances, "[t]he failure of a juror to disclose a relationship to one of the parties may entitle the prejudiced party to a new trial." Godby v. State, 736 N.E.2d 252, 256 (Ind. 2000) (citing Haak v. State, 275 Ind. 415, 417, 417 N.E.2d 321, 326 (1981); Barnes v. State, 263 Ind. 320, 330 N.E2d 743 (1975); Block v. State, 100 Ind. 357, 1885 WL 4222)). To obtain a new trial based on a claim of juror misconduct, the defendant must demonstrate that the misconduct was gross and likely harmed the defendant. Id. Furthermore, the defendant must present "specific, substantial evidence" establishing that a juror was possibly biased. Guyton v. State, 771 N.E.2d 1141, 1145 (Ind. 2002) (quoting Lopez v. State, 527 N.E2d 1119, 1130 (Ind. 1988)).

During voir dire, all prospective jurors were asked about any possible acquaintance with the victims, the victims' families, or any other trial witnesses. Fox did not disclose any relationship with Seibert. Seibert testified in post-conviction that she had recognized Fox at Stephenson's trial but did not know whether Fox recognized her. At some point during the trial, Fox was informed by his wife that Seibert was Fox's children's Sunday school teacher, and Fox realized that he had met Seibert. He did not inform the trial court of this fact. When he was asked about his relationship to Seibert at post-conviction review, Fox stated

> Oh, I just knew Miss Kim. You know, I didn't know what her name was or anything else, but, you know, when she told me that that is -- I put two and two together. You know, I just knew her name was Seibert or Seibert or however you pronounce it.

Although Fox should have informed the court of his acquaintance with Seibert when he discovered it, Stephenson has presented no specific evidence that Fox was biased and has made no showing that Fox's nondisclosure of this casual connection to Seibert had any effect on Fox's performance as a juror. In short, the post-conviction court's conclusion that juror Fox's relationship with Seibert "does not show bias or a predisposition to convict" was not clearly erroneous. Indeed, it seems clearly correct.

B. *Juror's Reading of Crime Novels*

Stephenson contends that foreperson Fox's reading of murder mysteries in the jury room during trial was exposure to extraneous information that contaminated the verdict and amounted to juror misconduct. As already noted, to warrant a new trial based on a claim of juror misconduct, the defendant must demonstrate not only that the misconduct was gross but also that it probably harmed the defendant. Carr v. State, 728 N.E.2d 125, 131 (Ind. 2000). Exposures to extrinsic influences during trial such as newspapers or television programs recounting facts of the trial are evaluated under this standard. See, e.g., id.

Juror Fox read crime novels at breaks throughout the eight months of trial. These novels were completely unrelated to Stephenson's trial. We are given no basis to conclude that they would affect a juror's impartiality. The post-conviction court concluded that "[t]he reading by juror Michael Fox of murder mystery books by author Patricia Cornwell is not juror misconduct, and does not indicate predisposition on the part of this juror to vote for conviction in this case." This finding was not clearly erroneous. Once again, it seems plainly correct.

C. *Jurors' Knowledge of Stephenson's Prior Altercation*

Stephenson argues that he was denied his right to due process when one juror mentioned an unrelated altercation involving Stephenson. During post-conviction review, Stephenson submitted the affidavit of juror Merrily Reiff stating:

> During the many months of the trial, the jury spent many hours in the small jury room behind the courtroom. On one occasion I overheard a woman juror talking with another juror about an incident involving John Stephenson at a bar in Newburgh. The woman juror mentioned that there had been some sort of scuffle and that John had used a shovel during the altercation. As the two jurors were talking, a third juror spoke up and said they should stop talking about the incident immediately, which they did.

The jurors never disclosed this information to the trial court. We have held that jurors' consideration of evidence not in the record amounts to the denial of a defendant's right to confrontation. See, e.g., Saperito v. State, 490 N.E.2d 274, 278 (Ind. 1986). However, not all constitutional error requires reversal. See id.; Dyer v. State, 168 Ind. App. 278, 283, 342 N.E.2d 671, 674 (1976). If the error is harmless beyond a reasonable doubt, the verdict will stand. Dyer, 168 Ind. App. at 283, 342 N.E.2d at 674. The decision to overturn a verdict based on jury contact

39

with outside information turns on the "special facts" of the case. Grigsby v. State, 267 Ind. 465, 468, 371 N.E.2d 384, 386 (1978) (citing Marshall v. United States, 360 U.S. 310, 312 (1959)). We look at the facts and determine whether the jury contact without outside information "has so prejudiced the defendant that he was denied a fair trial." Id. at 468, 371 N.E.2d at 386.

The State argues that there is no evidence to demonstrate "any predisposition by any juror to convict or otherwise affect deliberations or considerations of the issues by any juror." We agree. It appears that the exchange among the jurors was short, and the juror that overheard the other two did not mention the incident to the whole jury. Although it is unfortunate that any extraneous information was injected into deliberations, this information is not sufficient to constitute a per se contamination of the jury. Id. at 468, 371 N.E.2d at 386 ("[T]he Court has refused to hold that jury contact with outside information is always cause for overthrowing a verdict . . . ."). The post-conviction court's conclusion that the jurors' knowledge of the prior fight "does not show a predisposition on the part of any juror to convict, and has not been shown to have played any material part in deliberations, any individual juror's consideration of the case, or otherwise" was not clearly erroneous.

## IV.  Suppression of Material Evidence

Stephenson challenges the post-conviction court's conclusion that he failed to "prove by a preponderance of the evidence that that the State suppressed evidence that was material to Stephenson's guilt or to his punishment." Relying on Brady v. Maryland, 373 U.S. 83 (1963), Stephenson alleges that the State violated his right to due process when the State failed to provide Stephenson with information that corroborated his statement and alibi witnesses' testimony.

As we have repeatedly explained, under Brady, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or the bad faith of the prosecution." 373 U.S. at 87. To establish a Brady violation, a defendant must show "(1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that the evidence was material to an issue at trial." Conner v. State, 711 N.E.2d 1238, 1245-46 (Ind. 1999) (citing Minnick v. State, 698 N.E.2d 745, 755 (1998)). The evidence is material under Brady if "the defendant . . . establish[es] a reasonable probability that the result of the proceeding would be different if the State had disclosed [the] evidence." Azania v. State, 730 N.E.2d 646,

40

655 (Ind. 2000) (citing <u>Kyles v. Whitley</u>, 514 U.S. 410, 433-34 (1995)). Finally, "the State will not be found to have suppressed material information if that information was available to a defendant through the exercise of reasonable diligence." <u>Conner</u>, 711 N.E.2d at 1246 (citing <u>United States v. Morris</u>, 80 F.3d 1151, 1170 (7th Cir. 1996)).

Stephenson alleges that the State withheld a surveillance tape that corroborated the defense's version of events. In his statement to the police, Stephenson claimed that he spoke to the victims at Circle S, went to Mossberger's house, and then went home. <u>Stephenson</u>, 742 N.E.2d at 471. To investigate the truthfulness of Stephenson's statement, Officer Michael Hildebrand visited the Circle S. At trial Officer Hildebrand testified that the convenience store's surveillance tape already had been taped over when he went to review the videotape of the evening in question. The State argued that Stephenson's version of events as set forth in his statement to the police had to be inaccurate. Later at trial Stephenson testified that he was mistaken about the sequence of events and that he visited Mossberger first, went to Circle S, and then went home. At post-conviction review, Stephenson offered the affidavit of Lisa Huddleston, who was a clerk at the Circle S at all relevant times, to refute the testimony of Officer Hildebrand. The affidavit stated that Huddleston viewed the surveillance tape with an officer and that she saw both Stephenson and victim Southard on the tape. She did not offer testimony as to the time of the event shown on the tape. The defense asserts that "[i]n the absence of any corroboration of Stephenson's statement, the State was able to argue that Stephenson lied . . . . Being able to show that he lied in his statement allowed the State to argue that Stephenson himself should not be believed . . . ."

The State argues that the affidavit does not establish that the police suppressed evidence and that, in any event, Stephenson has failed to show that the tape was material evidence. We agree. Stephenson has made no showing that the tape was not available to the defense in the exercise of reasonable diligence. More importantly, there is no basis to conclude that the State suppressed the evidence, as opposed to its being erased in the usual course of Circle S's security procedures. Huddleston's affidavit, if fully credited, established only that Stephenson and Southard were at the store at some point in time.

The post-conviction court's conclusion that Stephenson failed to prove by a preponderance of the evidence that the State suppressed evidence that was material to his guilt or punishment was not clearly erroneous.

## Conclusion

The post-conviction court's denial of relief is affirmed.

Shepard, C.J., and Dickson, Sullivan, and Rucker, JJ., concur.

Shepard, C.J., concurs with separate opinion in which Dickson, J. joins.

**Shepard, Chief Justice, concurring.**

A few words about the rhetoric of modern death penalty litigation as regards the most common single issue – effective assistance of trial counsel.

Stephenson's two lawyers at trial were practitioners well known to the bench and bar. Lead counsel Anthony Long had thirty-five years experience in civil and criminal trial work, including four terms as Prosecuting Attorney for Warrick County, one of Indiana's fastest-growing jurisdictions and the site of the murders at issue. Co-counsel Dennis Vowels of Evansville had more than a decade of criminal law experience at the time of Stephenson's trial and had built a respectable reputation in the field of criminal defense. Both had received specialized training in the defense of capital cases.

The defense team went well beyond the lawyers, eventually consisting of six or seven altogether, including a variety of experts, a fact investigator, a mitigation specialist, and paralegals. The year that this team spent defending Stephenson was an intensive one in which the defense enjoyed essentially unlimited resources: a third of a million dollars in lawyer time, $65,000 worth of expert time, and mitigation and paralegal efforts that brought the defense bill to $558,000. The post-conviction record has provided the details of this collective effort at some length.

The contention now before us is that the foregoing defense was "perfunctory." It is declared "woefully short," "laughable," a defense conducted by lawyers who were "willfully uninformed."

The facts establish otherwise: a seasoned defense team of respected practitioners, aided by a collection of experts and investigators, mounting a defense with the benefit of vast financial resources. Well beyond any notion of what the Sixth Amendment guarantees.

Dickson, J., joins.