**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**SCOTT H. DUERRING**
Duerring Law Offices
South Bend, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JODI KATHRYN STEIN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| RANDY REEDER, | ) | |
| | ) | |
| Appellant-Petitioner, | ) | |
| | ) | |
| vs. | ) | No. 71A05-1210-PC-540 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Respondent. | ) | |

APPEAL FROM THE ST. JOSEPH SUPERIOR COURT
The Honorable John M. Marnocha, Judge
Cause No. 71D02-0901-PC-7

**August 2, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**NAJAM, Judge**

## STATEMENT OF THE CASE

Randy Reeder utilized the Davis/Hatton procedure[1] to bring this consolidated direct and post-conviction appeal challenging his four convictions for murder and his sentence. Reeder raises several issues for our review, which we consolidate and restate as follows:

1. Whether the post-conviction court erred when it concluded that Reeder was not denied the effective assistance of counsel;

2. Whether the trial court committed fundamental error when it admitted certain evidence or instructed the jury; and

3. Whether Reeder's aggregate sentence of 260 years is inappropriate in light of the nature of the offenses or Reeder's character.

We affirm Reeder's convictions and sentence.

## FACTS AND PROCEDURAL HISTORY

In December of 2006, Reeder was homeless and shared a room in the basement of an abandoned chemical plant, known as "the fort," in South Bend with a long-time friend, Daniel Sharp. Reeder and Sharp used a propane heater to stay warm. To prevent other homeless men who lived at the fort from taking the heater, they locked the door to their room. But in the late evening of December 20th, Reeder and Sharp entered their room to discover their propane tank missing and their room in disarray. Sharp heard the heater

---

[1] The Davis/Hatton procedure terminates or suspends a previously initiated direct appeal, upon a request for remand or stay, in order to allow the defendant to pursue a petition for post-conviction relief in the trial court. Hatton v. State, 626 N.E.2d 442 (Ind. 1993); Davis v. State, 267 Ind. 152, 368 N.E.2d 1149 (1977). This procedure allows the defendant to develop an evidentiary record with regard to certain claims raised on direct appeal. See Peaver v. State, 937 N.E.2d 896, 899 (Ind. Ct. App. 2010), trans. denied. Issues initially raised in the direct appeal as well as those determined in the post-conviction relief proceeding may be raised on appeal from the post-conviction court's judgment. See Slusher v. State, 823 N.E.2d 1219, 1222 (Ind. Ct. App. 2005).

running upstairs in a room occupied by four other homeless men: Michael Nolan, Jr., Michael Lawson, Jason Coates, and Brian Talboom.

Early the next morning, Talboom and Coates left the fort. Reeder grabbed a three-foot-long metal pipe, Sharp grabbed a hammer, and the two men entered the upstairs room. Reeder and Sharp kicked open the upstairs door and attacked Nolan and Lawson. Reeder beat Lawson to death. Reeder and Sharp nearly beat Nolan to death. They then positioned themselves to ambush Talboom and Coates upon their return. Reeder and Sharp lay in wait for about two hours. As Talboom and Coates entered the fort, Sharp attacked Talboom and Reeder attacked Coates before also striking Talboom. Both victims were bludgeoned to death. Reeder and Sharp then heard Nolan making noises from his room. Reeder returned to the room and beat Nolan to death.

Thereafter, Reeder and Sharp cleaned themselves up. Sharp collected the pipe, hammer, and their clothes and shoes and threw them in a nearby river. About a week after the murders, Reeder and Sharp dropped the victims' bodies down two nearby manholes. However, a shoeprint was left in the course of moving the bodies when Sharp stepped in the blood of one of the victims.

On January 9, 2007, local police began investigating the whereabouts of the four murdered men. South Bend Police Sergeant Ron Glon knew homeless men stayed at the fort and knew that those men would occasionally take copper from nearby underground substations. While showing the area to another officer, Sergeant Glon removed a manhole cover and observed two of the victims' bodies. Two days later, police discovered the other two victims nearby. Later autopsies revealed that each of the four

3

victims died of cranio-cerebral trauma consistent with blunt force impacts from a pipe and a hammer.

Officers began searching the fort for evidence. Among other things, the officers observed the bloody shoeprint, which was especially noticeable for an "imperfection in the heel." Transcript at 783. On January 30, officers interviewed Sharp and noticed that he was wearing shoes that matched the bloody shoeprint. Officers arrested Sharp and analyzed his shoe, which turned out to be a match to the shoe that created the bloody shoeprint.

Thereafter, Sharp confessed to the murders and implicated Reeder. Sharp walked officers through the fort and provided a detailed description of how the murders unfolded, which corroborated the physical evidence the police had already discovered. Sharp agreed to testify against Reeder in exchange for a maximum term of sixty-five years incarceration.

On February 5, 2007, the State charged Reeder with four counts of murder. While awaiting trial, Reeder shared a prison cell with Luke Henderson. Reeder described himself to Henderson as "the manhole killer." Id. at 574. Over the next several days, Reeder described to Henderson how he and Sharp had murdered their four victims. Henderson "figured that maybe [he] could use the information to the best of [his] advantage," and he contacted the homicide unit and shared Reeder's statements. Id. at 586.

The court held Reeder's jury trial in August of 2007. Sharp and Henderson both testified for the State and against Reeder. An investigating officer, Detective Randy

Kaps, also testified regarding statements made to him by both Sharp and Henderson. And, in describing the victims' deaths, the State had twenty-six autopsy photographs admitted into the record. Finally, various jury instructions informed the jury that, if the State proved its case beyond a reasonable doubt, the jury "should" convict Reeder. Appellant's App. at 30-34. The jury found Reeder guilty as charged, and the trial court sentenced Reeder to an aggravated term of sixty-five years for each conviction, to be served consecutively for a total term of 260 years.

Reeder appealed his convictions and sentence, and we dismissed his appeal without prejudice pursuant to the Davis/Hatton procedure. Before the post-conviction court, Reeder raised numerous allegations of ineffective assistance of trial counsel. Following an evidentiary hearing, on September 17, 2012, the post-conviction court denied Reeder's petition for relief. In particular, the post-conviction court entered the following findings of fact and conclusions of law:

> **ISSUE No. 1: [Whether] Reeder's trial counsel failed to adequately investigate the existence of an alibi or the existence of alibi[-]type evidence[,] which would have contradicted the testimony of Daniel Sharp.**
>
> At the evidentiary hearing held on Reeder's petition, Bryan and Valena Hughes testified at or near the time of the murders that Reeder was living with them, at their home in Niles, Michigan. . . .
>
> However, Bryan and Valena Hughes' memory was vague and not complete. Bryan Hughes testified that there were times when Reeder was not at the Hughes['] home . . . and Valena Hughes could not recall the exact dates that Reeder was at the Hughes['] home, except to say th[at] "he was there most nights."
>
> Further, even if the Hugheses had testified at trial, their testimony would have been contradicted by [six] other witnesses. . . .

5

Additionally, [trial counsel Brian] May testified that he and Reeder had discussed the possibility of filing an alibi defense and calling the Hugheses to testify, but that Reeder had decided to forego the defense and go to trial as scheduled.

**Accordingly, the court finds as follows:**
1. The Hughes[es'] testimony would not have provided Reeder with a complete alibi defense.
2. That the Hugheses['] testimony would have been controverted by other [S]tate's witnesses.
3. That Mr. May consulted with Reeder concerning the Hugheses' testimony and Reeder decided against delaying the trial.
4. That foregoing an alibi defense, in favor of going to trial as scheduled, was a tactical decision.

**Accordingly, the court concludes that** Reeder's trial counsel was not ineffective with respect to this issue.

\* \* \*

**ISSUE No. 3: [Whether] Reeder's trial counsel failed to contact and depose Jeff Kirkland and Jeff Smith; failed to call, as a witness, Eric Logan; and failed to adequately cross examine a [S]tate's witness, Luke Henderson.**

At the PCR hearing, Reeder testified that he believed that Jeff Smith and Eric Logan were present in the courtroom when Daniel Sharp entered his plea of guilty with respect to these murders. He testified as to what Smith and Logan told him Sharp [had] said at his plea hearing. Neither a transcript of Sharp's plea hearing was introduced as evidence at Reeder's PCR hearing, nor did Smith or Logan testify at that hearing. Further, neither Smith nor Logan testified at Reeder's trial.

Reeder also claims that a transcript of Sharp's plea hearing would have been, in some way, helpful to him at trial. Daniel Sharp did testify at trial and was subject to cross-examination.

As to Jeff Kirkland, Reeder's claim is that Kirkland, if called as a witness, would have testified that Sharp stated that he was going to "frame" [R]eeder for the murders. However, in his trial testimony, not only did Daniel Sharp testify as to Reeder's involvement in the murders, but also [as] to his own. Further, Sharp's testimony was corroborated by Luke Henderson, who testified that Reeder admitted to the killings.

6

At trial, Mr. May cross-examined Henderson as to his criminal record; as to Henderson's intent to use the information which he got from Reeder to his best advantage; as to his hoping to receive a lower sentence or "time cut" as a result of his prov[id]ing information; and as to Daniel Sharp's plea hearing. Mr. May did not believe that it would be "helpful" to call other prisoners to testify concerning Henderson.

\* \* \*

**Accordingly, the court finds as follows:**
1.      The only testimony offered at the PCR hearing as to what Jeff Smith, Jeff Kirkland, and Eric Logan[] might have said were the hearsay statements offered by Reeder, which the court finds to be self-serving, uncorroborated, and unconvincing.
2.      The decision to not call witnesses (other prisoners) was a tactical decision made by Mr. May.
3.      Mr. May adequately cross-examined Henderson, not only to the substance of his knowledge, but as to his motivations for testifying, and his credibility as a witness.
4.      Mr. May adequately and completely cross-examined Daniel Sharp.

**Accordingly, the court concludes that** Reeder's trial counsel was not ineffective with respect to this issue, and, further, that Reeder has failed in his burden of proof.

Id. at 95-100 (citations and footnote omitted). This appeal ensued.

**DISCUSSION AND DECISION**

**Issue One:  Reeder's Post-Conviction Appeal**

We first consider Reeder's appeal from the post-conviction court's denial of his petition for post-conviction relief. Our standard of review is well established:

The petitioner bears the burden of establishing his grounds for post-conviction relief by a preponderance of the evidence. Ind. Post-Conviction Rule 1(5); Harrison v. State, 707 N.E.2d 767, 773 (Ind. 1999), cert. denied, 529 U.S. 1088, 120 S. Ct. 1722, 146 L. Ed. 2d 643 (2000). To the extent the post-conviction court denied relief in the instant case, [the petitioner] appeals from a negative judgment and faces the rigorous burden of showing that the evidence as a whole "'leads unerringly and unmistakably to a conclusion opposite to that reached by the [ ] court.'" See Williams v.

State, 706 N.E.2d 149, 153 (Ind. 1999) (quoting Weatherford v. State, 619 N.E.2d 915, 917 (Ind. 1993)), cert. denied, 529 U.S. 1113, 120 S. Ct. 1970, 146 L. Ed. 2d 800 (2000). It is only where the evidence is without conflict and leads to but one conclusion, and the post-conviction court has reached the opposite conclusion, that its decision will be disturbed as contrary to law. Bivins v. State, 735 N.E.2d 1116, 1121 (Ind. 2000).

Peaver v. State, 937 N.E.2d 896, 900 (Ind. Ct. App. 2010), trans. denied. Further, we review the post-conviction court's factual findings under a clearly erroneous standard. Stephenson v. State, 864 N.E.2d 1022, 1028 (Ind. 2007). We will not reweigh the evidence or judge the credibility of witnesses. Id.

Reeder's arguments on appeal are premised on his theory that he was denied the effective assistance of trial counsel. A claim of ineffective assistance of counsel must satisfy two components. Strickland v. Washington, 466 U.S. 668 (1984). First, the defendant must show deficient performance: representation that fell below an objective standard of reasonableness, committing errors so serious that the defendant did not have the "counsel" guaranteed by the Sixth Amendment. Id. at 687-88. Second, the defendant must show prejudice: a reasonable probability (i.e., a probability sufficient to undermine confidence in the outcome) that, but for counsel's errors, the result of the proceeding would have been different. Id. at 694.

Here, Reeder asserts that the post-conviction court erred when it denied his petition for three reasons. First, Reeder argues that his counsel rendered ineffective assistance when he failed to call the Hugheses as witnesses to provide alibi testimony. Second, Reeder contends that his trial counsel's failure to call Eric Logan as a witness was not a tactical decision. And, third, Reeder asserts that his trial counsel failed to

8

adequately cross-examine Henderson regarding whether Henderson had learned of the allegations against Reeder by attending Sharp's guilty plea hearing.[2]

Reeder has not satisfied his burden on appeal. The post-conviction court expressly found that the Hugheses' testimony was "vague" and "would not have provided Reeder with a complete alibi defense." Appellant's App. at 96-97. The court further found that, regardless of whether calling Logan as a witness was a tactical decision, Reeder's "self-serving, uncorroborated, and unconvincing" evidence regarding Logan's purported statements was not worthy of credit. Id. at 99. And the court held that, even without the missing pages from Sharp's guilty plea transcript, May adequately cross-examined Henderson. Id. at 99-100. The burden to prove the relevance of Sharp's guilty plea transcript was on Reeder, and his mere speculation that it might have been helpful to him does not demonstrate reversible error.

As such, none of Reeder's arguments on appeal from the post-conviction court's judgment demonstrates that "the evidence is without conflict and leads to but one conclusion, and the post-conviction court has reached the opposite conclusion." Peaver, 937 N.E.2d at 900. Reeder's arguments on appeal are merely requests for this court to reweigh the evidence before the post-conviction court, which we will not do. We affirm the post-conviction court's judgment.

### Issue Two:  Reeder's Direct Appeal
### Challenge to his Convictions

We next consider Reeder's challenge to his convictions on direct appeal. Specifically, Reeder asserts the following: (1) that the trial court committed fundamental

---

[2] Reeder's second and third arguments on appeal were both addressed under "ISSUE No. 3" in the post-conviction court's order.

error when it permitted Detective Kaps to testify regarding statements made to him by Sharp and Henderson; (2) that the trial court committed fundamental error when it permitted the State to introduce the autopsy photographs[3]; and (3) that the trial court committed fundamental error when it instructed the jury that, if the State proved its case beyond a reasonable doubt, it "should" convict Reeder. See Appellant's App. at 30-34.

To constitute fundamental error, the error must constitute a blatant violation of basic principles, the harm or potential for harm must be substantial, and the resulting error must deny the defendant fundamental due process. Brown v. State, 799 N.E.2d 1064, 1067 (Ind. 2003) (quotation omitted). It must be so prejudicial to the rights of a defendant as to make a fair trial impossible. Id. (quotation omitted). "[W]e view this exception as an extremely narrow one, available only when the record reveals clearly blatant violations of basic and elementary principles of due process, and the harm or potential for harm cannot be denied." Canaan v. State, 683 N.E.2d 227, 235 n.6 (Ind. 1997) (quotations and alteration omitted), cert. denied, 524 U.S. 906 (1998).

None of Reeder's arguments demonstrates fundamental error. Detective Kaps' testimony regarding statements made to him by Sharp and Henderson, who were themselves witnesses subject to cross-examination, was not a blatant violation of Reeder's basic rights. See Ind. Evidence Rule 801(d)(1)(B) (allowing testimony on a

---

[3] Reeder raised this issue to the post-conviction court under the claim that his trial counsel rendered ineffective assistance for failing to object to the autopsy photographs, and the post-conviction court denied Reeder's petition for relief on this issue. But Reeder does not appeal that portion of the post-conviction court's judgment, instead raising the issue as a question of fundamental error on direct appeal. We have serious reservations about allowing a defendant to use the Davis/Hatton procedure to develop an evidentiary record on an issue, lose on that issue in the post-conviction court, and then ignore the adverse ruling by reframing the issue as an issue on direct appeal. See, e.g., Peaver, 937 N.E.2d at 899-900 (holding that a defendant "may not divide the specific [ineffective assistance of counsel] contentions alleged between his direct appeal and his petition for post-conviction relief"). Nonetheless, as the State does not suggest that this issue is procedurally foreclosed from appellate review, we briefly address it.

prior witness's statements "consistent with the declarant's testimony, offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive, and made before the motive to fabricate arose"). Neither is the admission of gruesome autopsy photographs blatant error. See, e.g., Helsley v. State, 809 N.E.2d 292, 296 (Ind. 2004) ("even gory and revolting photographs may be admissible as long as they are relevant to some material issue or show scenes that a witness could describe orally.") (alteration and quotation omitted). And the court's instructions that the jury "should" render a verdict consistent with its view of the evidence also is not a blatant violation of Reeder's basic rights. See, e.g., Morgan v. State, 755 N.E.2d 1070, 1073-74 (Ind. 2001) (rejecting a similar argument). Accordingly, we affirm Reeder's convictions.

### Issue Three: Reeder's Direct Appeal
### Challenge to his Sentence

Finally, Reeder appeals his 260-year aggregate sentence under Indiana Appellate Rule 7(B). Although a trial court may have acted within its lawful discretion in determining a sentence, Article VII, Sections 4 and 6 of the Indiana Constitution "authorize[] independent appellate review and revision of a sentence imposed by the trial court." Roush v. State, 875 N.E.2d 801, 812 (Ind. Ct. App. 2007) (alteration original). This appellate authority is implemented through Indiana Appellate Rule 7(B). Id. Revision of a sentence under Appellate Rule 7(B) requires the appellant to demonstrate that his sentence is inappropriate in light of the nature of his offense and his character. See Ind. Appellate Rule 7(B); Rutherford v. State, 866 N.E.2d 867, 873 (Ind. Ct. App. 2007). We assess the trial court's recognition or non-recognition of aggravators and mitigators as an initial guide to determining whether the sentence imposed was

inappropriate. Gibson v. State, 856 N.E.2d 142, 147 (Ind. Ct. App. 2006). However, "a defendant must persuade the appellate court that his or her sentence has met th[e] inappropriateness standard of review." Roush, 875 N.E.2d at 812 (alteration original).

Moreover, "sentencing is principally a discretionary function in which the trial court's judgment should receive considerable deference." Cardwell v. State, 895 N.E.2d 1219, 1222 (Ind. 2008). Indiana's flexible sentencing scheme allows trial courts to tailor an appropriate sentence to the circumstances presented. See id. at 1224. The principal role of appellate review is to attempt to "leaven the outliers." Id. at 1225. Whether we regard a sentence as inappropriate at the end of the day turns on "our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other facts that come to light in a given case." Id. at 1224.

Reeder's sentence is not inappropriate. The nature of Reeder's offenses was brutal and callous. And Reeder has an extensive criminal history consisting of four prior felonies and sixteen prior misdemeanors over nearly twenty years. Moreover, we are not persuaded by Reeder's suggestion on appeal that his sentence should be commensurate with Sharp's sixty-five year sentence when Sharp, and not Reeder, fully cooperated with the State in investigating and prosecuting the instant offenses and pleaded guilty. Thus, we affirm Reeder's sentence.

## Conclusion

We affirm Reeder's convictions and sentence.

Affirmed.

BAILEY, J., and BARNES, J., concur.