## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Feb 04 2015, 9:37 am

CLERK
of the supreme court,
court of appeals and
tax court

APPELLANT PRO SE

Elwin Hart
Michigan City, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Jodi Kathryn Stein
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Elwin Hart,

*Appellant-Petitioner,*

v.

State of Indiana,

*Appellee-Respondent*

February 4, 2015

Court of Appeals Cause No.
49A05-1406-PC-273

Appeal from the Marion Superior Court
The Honorable Marc T. Rothenberg
Cause No. 49G02-1002-PC-013454

**Bailey, Judge.**

# Case Summary

[1] Pro-se Petitioner Elwin Hart ("Hart") appeals the denial of his petition for post-conviction relief, which challenged his convictions for two counts of murder.

He presents the sole issue of whether the post-conviction court properly denied relief on res judicata grounds. We affirm.

# Facts and Procedural History

The relevant facts were recited by a panel of this Court on direct appeal:

> In February 2010, Chad Nickle, his girlfriend Elizabeth Newcomer, his mother Linda Nickle, and Linda's boyfriend Hart all lived together in a house on the southwest-side of Indianapolis. Chad and Elizabeth, who were engaged to be married, had recently moved in with Linda and Hart to help them pay bills. In addition, Linda and Hart had recently purchased a white Chevy Silverado truck that Hart drove.
>
> Chad worked out of state for eleven months of the year doing environmental demolition and was in Milwaukee, Wisconsin, on February 20, 2010. On that morning, Elizabeth called Chad and told him that she had found a baggie of white powder that she suspected to be cocaine. Chad instructed Elizabeth and Linda to go to a nearby bike shop, Thugs Incorporated Choppers, so that his friend Dennis Gibson could test the white powder. Dennis, who had experimented with cocaine before, tasted the powder and concluded that it was cocaine. Based on this information, Chad told Elizabeth to tell his mother that Hart had to move out. Chad directed the women to call him right after they told Hart the news. Dennis also told the women that if they needed help evicting Hart, they should call him.
>
> Around 2:00 p.m., Chad still had not heard from his fiancée or mother. Because Chad was concerned that he could not reach them by phone, he had Dennis and another bike shop employee go to the house. They knocked on the door, but no one answered. They spotted Elizabeth's red truck in the driveway but not Hart's white truck. Dennis called Chad to report their findings.
>
> Around 4:00 p.m., Chad received a concerned call from Elizabeth's mother because Elizabeth did not show up at a family event. Chad then contacted a childhood friend, Daniel Sprouse, and asked him to

go to the house. At the time, Daniel and his wife were in Noblesville at a swim meet. When Daniel arrived at the house, he observed Elizabeth's red truck in the driveway and Linda's car in the garage. Hart's white truck was not there. Chad instructed Daniel to ring the doorbell, pound on his mother's bedroom window, and beat on the garage door. Chad and Daniel stayed on the phone the entire time. When there was no response, a frantic Chad instructed Daniel to break in. Daniel broke a window on a door that led to the garage and entered the house. Upon entering the living room, Daniel started screaming to Chad over the phone that Elizabeth and Linda were dead. Both had been shot in the head and were sitting upright with the television still on. A dropped coffee cup was at Linda's feet. Elizabeth was shot three times, and Linda was shot once. Daniel rushed out of the house and told his wife to call 911. While Daniel and his wife were standing in the middle of the street waiting for emergency responders, they noticed a white Chevy truck that they believed to be Hart's parked on the wrong side of the street about 200 feet away. Daniel and his wife called 911 again. Fearing for their safety, Daniel and his wife took shelter in their car. The white truck backed up and disappeared.

Emergency responders arrived at 5:08 p.m. and confirmed that Elizabeth and Linda were dead. Their identifications and cell phones were missing, but there were no other signs of a robbery, as nothing was missing and the house was in a neat and orderly condition. Police recovered a baggie of white powder from the kitchen, but it was later determined not to be cocaine.

In the meantime, Hart called his boss, Victor Fleming, and left two voicemails saying that he would not be at work on Monday. According to Victor, the first voicemail stated:

Victor, it's me, Elwin Hart. I'm calling you to thank you for the opportunity to work with Laker Medical. You are great people and I enjoy to work [sic] with you. I hope everything will be better, but I won't be able to come back to work on Monday because something is not – something went wrong.

Tr. P. 307, 314. According to Victor, the second voicemail stated:

Thank you for the opportunity. Thank you for you guys. You guys are good people and I appreciate the opportunity to work with your company, but I won't be able to go back to work on Monday since I did something very wrong and I'm about to turn myself in to the police.

*Id.* at 311, 314.[1]

Hart then went to Lynhurst Baptist Church, where he had been attending services for several years. He called 911 from the church at 5:17 p.m. and told the dispatcher that he was calling to report a double homicide that had occurred at his residence and he would meet the police at the front door of the church. While inside the church, Hart encountered longtime church member Shirley Clements who was there for her granddaughter's wedding. The wedding was over, and the wedding party and family had finished taking pictures and were getting ready to go to the reception. Hart asked Shirley if he could see the pastor. Shirley said that the pastor had just left. Hart responded that he wanted to see the pastor "but that he couldn't wait any longer" because "the police were on their way out there to arrest him." *Id.* at 203. When Shirley asked him "[w]hat in the world … the police [were] going to arrest [him] for," Hart responded that he had "shot Linda and her future daughter-in-law" around noon." *Id.* Hart added that "he wasn't going to let them frame him the way they were trying to do." *Id.* When Hart explained that he had come to church to pray with the pastor, Shirley said she would pray with him instead. Shirley then summoned her nearby husband, and the three of them prayed on

---

[1] Victor said that both voicemails had been recorded by a detective; however, by the time of trial, that detective had died and neither the voicemails nor a transcript of the voicemails could be found.

the spot. After the prayer, Hart and Shirley hugged, and Hart said that he was going to wait for the police outside. Because Shirley had to get to the wedding reception, she had a church elder, Bruce Litton, wait with Hart. While they were waiting, Hart told Bruce that Linda had found some white powder in the kitchen and claimed it was his. Linda then had the white powder tested at a motorcycle shop to see if it was in fact cocaine. Hart was adamant during his conversation with Bruce that he did not use cocaine. Hart explained that he and Linda got into an argument over whether the substance was in fact cocaine, at which point Linda told him to move out. At this point, police pulled up and ordered Hart to show his hands. When the police asked where the weapon was, Hart responded that it was in his truck. A search of Hart's truck revealed a pistol, two magazines, and a box containing marijuana. The forensic testing from the pistol was "inconclusive," meaning that the pistol could not be identified or eliminated as the murder weapon. *Id*. at 269. Nevertheless, the testing on the bullets recovered from the victims showed that all four bullets were fired from the same gun.

Days later, the State charged Hart with two counts of murder, Class A misdemeanor carrying a handgun without a license, and Class A misdemeanor possession of marijuana. A three-day jury trial was held in May 2011. The jury found him guilty as charged, and the trial court sentenced him to an aggregate term of 110 years.

*Hart v. State*, No. 49A02-1107-CR-583, slip op. at 2-6 (Ind. Ct. App. Mar. 13, 2012).

[3] On direct appeal, Hart challenged the sufficiency of the evidence to support his conviction. His conviction was affirmed. *Id.* at 2.

[4] On April 12, 2012, Hart filed a petition for post-conviction relief, challenging Shirley Clement's testimony, Victor Fleming's testimony, and Daniel Sprouse's "braking [sic] into the primises [sic]." (App. 3.) On March 19, 2014, the post-

conviction court held an evidentiary hearing at which Hart presented argument but no evidence or exhibits.

[5]     On June 3, 2014, the post-conviction court issued its findings of fact, conclusions of law, and order denying Hart post-conviction relief.  This appeal ensued.

# Discussion and Decision

## Standard of Review

[6]      The petitioner in a post-conviction proceeding bears the burden of establishing the grounds for relief by a preponderance of the evidence.  Ind. Post-Conviction Rule 1(5); *Fisher v. State*, 810 N.E.2d 674, 679 (Ind. 2004).  When appealing from the denial of post-conviction relief, the petitioner stands in the position of one appealing from a negative judgment.  *Id.*  On review, we will not reverse the judgment of the post-conviction court unless the evidence as a whole unerringly and unmistakably leads to a conclusion opposite that reached by the post-conviction court.  *Id.*  A post-conviction court's findings and judgment will be reversed only upon a showing of clear error, that which leaves us with a definite and firm conviction that a mistake has been made.  *Id.*  In this review, findings of fact are accepted unless they are clearly erroneous and no deference is accorded to conclusions of law.  *Id.*  The post-conviction court is the sole judge of the weight of the evidence and the credibility of witnesses.  *Id.*

# Analysis

In relevant part, the post-conviction order denying Hart relief stated:

> While it is not completely clear, the only reasonable interpretation is that by his Post Conviction Relief Petition, Hart is raising free-standing issues challenging the evidence used to convict him. Specifically, Hart appears to claim that certain details of testimony from trial witnesses are incorrect and therefore the evidence does not support his conviction. Sufficiency of the evidence supporting his convictions was the only issue raised in his appeal, and the Court of Appeals reviewed the evidence at length and determined that there was sufficient evidence. It is by now beyond dispute that issues previously adjudicated in the appellate process are unavailable to a petitioner seeking Post-Conviction Relief, under the doctrine of *res judicata*.

(App. 38.)

Post-conviction procedures do not afford petitioners with a "super-appeal"; rather, the post-conviction rules contemplate a narrow remedy for subsequent collateral challenges to convictions. *Reed v. State*, 856 N.E.2d 1189, 1194 (Ind. 2006). The purpose of a petition for post-conviction relief is to provide petitioners the opportunity to raise issues not known or available at the time of the original trial or direct appeal. *Stephenson v. State*, 864 N.E.2d 1022, 1028 (Ind. 2007). If an issue was known and available but not raised on direct appeal, the issue is procedurally foreclosed. *Id.* If an issue was raised and decided on direct appeal, it is res judicata. *Id.* Moreover, collateral challenges to convictions must be based upon grounds enumerated in the post-conviction rule. *Shanabarger v. State*, 846 N.E.2d 702, 707 (Ind. Ct. App. 2006), *trans. denied*; *see also* Post-Conviction Rule 1(1).

[9] To the extent that Hart attempted to challenge the admission of certain trial testimony, this was available to him on direct appeal. The issue is now procedurally foreclosed. To the extent that Hart attempted to challenge his convictions by claiming insufficiency of the evidence, this issue was raised on direct appeal and is *res judicata*. The post-conviction court properly declined to address the merits of Hart's free-standing issues and properly denied him post-conviction relief.

[10] Affirmed.

Robb, J., and Brown, J., concur.